**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ROCKWELL MANUFACTURING COMPANY (DU BOIS DIVISION), Respondent.**

**No. 12815.**

United States Court of Appeals Third Circuit.

Argued May 25, 1959.

Decided Oct. 8, 1959.

---

110

Standau E. Weinbrecht, Washington, D. C. (Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Owsley Vose, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

William U. Smith, Clearfield, Pa. (Frank G. Smith, Smith & Smith, Clearfield, Pa., on the brief), for respondent.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This is a petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, to enforce its order issued against the respondent in proceedings under Section 8(a) of the Act.[1]

The issues presented are whether the Board properly found that (1) the respondent violated Section 8(a) (1) of the Act by enforcing its no-distribution rule so as to prevent employees from distributing union literature in the parking lot outside respondent's plant, and (2) respondent's foremen violated Section 8(a) (1) by interrogating employees about their union sympathies and "cautioning" them concerning their activities in behalf of union organization.

It must immediately be noted that the situation here is unusual in these respects: on the score of the first issue, the Board's trial examiner in his Intermediate Report found that since respondent had a long-standing valid rule prohibiting unauthorized distribution of literature on its property it did not engage in an unfair labor practice by denying an employee request to distribute union literature on the company parking lot, and the Board decided otherwise; on the score of the second issue the trial examiner found that respondent did not violate the Act by reason of its supervisory employees' conversation with and interrogation of three of its employees—

---

1. 61 Stat. 136 et seq., 29 U.S.C.A. § 151 et seq. The Board's decision and order are reported at 121 N.L.R.B.No. 47 (1958).

Youngren, Case and Lenkerd,—and the Board held to the contrary. Adding further filip to the conflict of findings between the trial examiner and the Board is the circumstance that while the former held that a speech of respondent's general manager (Hudson) to its employees anent efforts to unionize its plant violated the provisions of the Act, the Board held that the speech was "innocent of any threat of reprisal or force or promise of benefit" and was therefore "privileged under Section 8(c) of the Act."

Pursuant to its determinations, as above stated, the Board ordered respondent to cease and desist from preventing its employees from distributing union literature on its parking lots; from interrogating its employees concerning membership in, or activities on behalf of the union and from threatening them with sanctions because of such membership or activities. Affirmatively, the Board's order requires respondent to post appropriate notices announcing its intention to refrain from the prohibited activities.

It may be stated preliminarily that the respondent, Rockwell Manufacturing Company, is engaged in the production of a diversified line of industrial equipment sold and shipped in interstate commerce. Its Du Bois Division consists of Plants Nos. 1 and 2 in Du Bois, Pennsylvania, and a third plant in the neighboring town of Sykesville. Included as a part of Plant No. 1 is the NYA building, about two blocks away.

Plant No. 1, where most of the incidents here in issue took place, is located in an urban area. There are highways on two sides of the plant. It has broad sidewalks. Adjacent to one side of the plant is a large parking lot, owned by respondent, which accommodates some two hundred automobiles. Across from the plant, off the highway, is a smaller one-hundred car parking lot.

Approximately eighty to eighty-five percent of the plant employees use the larger parking lot. About 400 feet from the highway entrance to this lot there is an entrance to the plant. The respondent's time clock is located at the plant entrance—off the parking lot.

For the sake of convenience the separate issues presented will be separately discussed.

First, as to respondent's enforcement of its no-distribution rule on its parking lot, and the testimony adduced with respect to it:

Respondent in 1951 promulgated a rule prohibiting distribution of all literature on its property without its specific prior approval.

In the latter part of January, 1957, Fred Mensch, an International Representative of the International Union of Electrical, Radio and Machine Workers, AFL–CIO, met with several Rockwell employees to discuss organization of respondent's plants.

On February 8, 1957, union advocates distributed pro-union literature to the employees of the plants on the public sidewalk as they entered the parking lot on their way to work. Later that day a notice was posted by respondent on its bulletin boards informing the employees that distribution of literature on its premises without its prior approval was prohibited by established company rules, and that violators would be subject to disciplinary action which might result in dismissal.[2]

2. The posted rule read as follows:
"To All Employees
"A regulation of long standing provides that the Personnel Department shall be responsible for the posting and approval of all employee communications.
"It has been reported that literature has been distributed to the employees on Company premises without Company approval. Such practices are prohibited by established Company rules. Persons who post notices, and distribute literature of any kind, on Company property will be subject to disciplinary action which may result in discharge.
"Your cooperation in helping your Company operate an orderly and efficient plant will be appreciated.
"W. L. Cunningham
Factory Manager"

The respondent's no-distribution policy was complied with by all employees,[3] although four employees did request permission to distribute union literature at the employees' entrance to the plant—the point at which the employees left the parking lot to "punch in". There has been no discrimination in the enforcement of the rule. Both respondent and the employees who requested permission to distribute literature recognized that any permission would have to apply equally to pro- and anti-union employees. The request was not granted.

Respondent's failure to grant this request resulted in a complaint being filed with the National Labor Relations Board charging that the respondent committed an unfair labor practice in that it interfered with, restrained or coerced its employees in the exercise of their right of self-organization as guaranteed in Section 7 of the Act.[4] As earlier stated, the trial examiner dismissed these charges and the Board held to the contrary [5] and issued an order that respondent cease and desist from preventing employees from distributing union literature in its parking lot. Respondent was given the right to establish necessary, reasonable, non-discriminatory regulations governing such distribution.

The law which governs the validity of a non-discriminatory no-distribution rule has been laid down in three Supreme Court cases.

The first was Republic Aviation Corporation v. National Labor Relations Board (together with National Labor Relations Board v. Le Tourneau Company of Georgia), 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. In the Le Tourneau case the employer had a broad no-distribution of literature rule which was enforced without discrimination so as to bar employees from distributing union literature on company-owned parking lots. The Board, holding that such a bar was an unfair labor practice, specifically found that because of the physical isolation of the plant and because of the widely scattered residences of employees, the distribution of literature to employees was rendered "virtually impossible", direct contact with employees away from the plant "extremely difficult" and self-organization "seriously impeded".[6] The Board, in part, relied on Matter of Peyton Parking Company,[7] where it adopted a presumption that a broad company prohibition against solicitation on company property during non-working hours was presumed invalid unless "special circumstances make the rule necessary * * *".[8] The Supreme Court upheld the Board's determination, finding no error in the Board's adoption of the presumption.

The second case was National Labor Relations Board v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 where the employer refused to permit distribution of union literature by non-employee union organizers on company-owned parking lots. The Board held this to be an unreasonable impediment to the employees' right to self-organization. It found that due to the physical location of the plant the only safe and practicable place for the distribution of literature to employees was on the parking lots. The sidewalks and streets were not safe. Other means of

3. There was one infraction of the rule but the propriety of the infraction depended on the validity of the rule and since the Board did not treat the event separately it will not be discussed here.

4. 61 Stat. 140.

5. The Board held, in part, as follows: "We find that since the Respondent did not have an unqualified right to prohibit employees from distributing union literature on its parking lots and, since it failed

to offer any valid reason for the application of its no-distribution rule, it unreasonably impeded and interfered with the right of self-organization guaranteed its employees by Section 8(a) (1) of the Act."

6. Le Tourneau Company of Georgia, 54 NLRB 1253, 1261 (1944).

7. 49 NLRB 828; 50 NLRB 355 (1943).

8. 49 NLRB at 844 (1943).

communication, such as telephone, advertising, mailing and home visitations were available. The Supreme Court reversed the Board stating that the rule with respect to non-employee distributions on plant property differed from that for employees. Unless the non-employees could show that the employees were beyond the reach of reasonable union efforts to communicate with them through other means, the employer could bar the non-employees from distributing union literature so long as the bar did not discriminate against the non-employees by allowing other distributions.

The third case was National Labor Relations Board v. United Steelworkers of America, 1958, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383. In this case Nu-Tone, Inc. posted a series of no-solicitation rules which included a rule against the distribution of any literature on company property—company property being defined to include parking lots.[9] The company enforced this rule against pro- and anti-union employees but itself distributed non-coercive anti-union literature. The proceeding before the Board was instituted by the union, whose rights, as non-employees, were governed by the principles enunciated in the Babcock & Wilcox case. The issue raised was whether enforcement of the rule—at the same time the company was violating it—constituted an unfair labor practice. The trial examiner,[10] the Board,[11] and the Supreme Court[12] all conceded that the rule itself was valid, apparently because, as the trial examiner stated, " * * * prohibiting the distribution of literature on the parking lot did not, under the circumstances shown by the record, constitute an unreasonable impediment to communication * * * since distribution was as effectively made from the sidewalk, immediately adjacent, as

on the lot itself." [13] After stating that "Employer rules prohibiting organizational solicitation are not in and of themselves violative of the Act, for they may duly serve production, order and discipline. See Republic Aviation Corp[oration] v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975", [14] the Supreme Court said:

"No attempt was made * * * to make a showing that the no-solicitation rules truly diminished the ability of the labor organizations involved to carry their message to the employees. Just as that is a vital consideration in determining the validity of a no-solicitation rule, see Republic Aviation Corp[oration] v. National Labor Relations Board, supra, 324 U.S. at pages 797–798, 65 S.Ct. at pages 985–986; National Labor Relations Board v. Babcock & Wilcox Co., supra, 351 U.S. at page 112, 76 S.Ct. at page 684, it is highly relevant in determining whether a valid rule has been fairly applied. * * * If, by virtue of the location of the plant and its facilities and resources available to the union, the opportunities for effectively reaching the employees with a pro-union message, in spite of a no-solicitation rule, are at least as great as the employer's ability to promote the legally authorized expression of his anti-union views, there is no basis for invalidating these 'otherwise valid' rules. The Board, in determining whether or not the enforcement of such a rule in the circumstances of an individual case is an unfair labor practice, may find relevant alternative channels

9. NuTone, Inc., 112 NLRB 1153 at 1164 (1955).

10. Id. at 1165.

11. Id. at 1154.

12. National Labor Relations Board v. United Steelworkers of America, 1958,

357 U.S. 357 at page 364, 78 S.Ct. 1268 at page 1272, 2 L.Ed.2d 1383.

13. NuTone, Inc., 112 NLRB 1153 at 1165 n. 5 (1955).

14. Id. at pages 361–362, 78 S.Ct. at page 1271.

available for communications on the right to organize. When this important issue is not even raised before the Board and no evidence bearing on it adduced, the concrete basis for appraising the significance of the employer's conduct is wanting." [15]

The Supreme Court then reversed the Board for failing to make findings that reasonable alternatives were not open to the union to distribute its solicitation literature.

In accordance with the foregoing the Board in the instant case, having found that the respondent's no-distribution rule was enforced against employee distributions in its parking lot, properly required respondent to come forward with evidence to justify the rule.[16]

However, when the respondent offered evidence by way of justification, the Board was bound to consider not only the evidence that was offered as to the impact that the distribution of literature would have on plant discipline, cleanliness, order, etc., but also the effect that the bar against distribution would have on the ability of the employees to organize. Thus, the Board was constrained to consider such evidence as the availability of sidewalk distributions, the small size of the community as indicating the practicality of home solicitation and telephonic communications, as well as the evidence that anti-union employees would of necessity have been distributing literature at the employees' entrance at the same time as pro-union employees. The Board also should have considered the fact that if *employees* were permitted to distribute literature, *non-employees* could no longer be barred under the holding of Babcock & Wilcox, supra.

As the Supreme Court said in the Republic Aviation case the Board's duty is " * * * working out an adjustment between the undisputed right of self-organization * * * and the equally undisputed right of employers to maintain discipline in their establishments. Like so many others, these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer and employee. Opportunity to organize and proper discipline are both essential elements in a balanced society." [17]

This is not to say that the Board could not apply a presumption of invalidity to the no-distribution rule. But the burden of proving the unfair labor practice is on the charging party.[18] In order to determine whether the respondent had justified its rule the Board is compelled to examine all of the evidence.[19] If the respondent is entitled to justify its rule, the Board must examine respondent's evidence. Clearly, if the employees have virtually no alternative opportunities to distribute literature and membership applications, then the respondent must show strong justification for its prohibition. Conversely when, as the respondent contends in this case, the employees have readily available alternative means of distribution, the employer's duty to show exceptional justifying circumstances is lessened.

Moreover, the Board's decision merely held that the respondent had offered no

---

15. Id. at pages 363-364, 78 S.Ct. at page 1272.

16. Republic Aviation Corporation v. National Labor Relations Board, supra; 2 Davis, Admin.Law 372 (1958).

17. Republic Aviation Corporation v. National Labor Relations Board, 1945, 324 U.S. 793, 797-798, 65 S.Ct. 982, 985, 89 L.Ed. 1372.

18. Local No. 3, United Packinghouse Workers of America, C.I.O. v. National Labor Relations Board, 8 Cir., 1954, 210 F.2d 325; National Labor Relations Board v. National Die Cast. Co., 7 Cir., 1953, 207 F.2d 344.

19. The Board discharged this duty in the Le Tourneau case when it analyzed the evidence bearing on the question "To what extent then does the respondent's rule impede the effective exercise of the right to self-organization?", 54 N.L.R.B. at 1260, and reached the conclusions indicated above at note 6, supra.

"valid reason for the application of its no-distribution rule". Nowhere does the Board's decision indicate that it considered the substantial evidence offered by respondent in justification of its rule, nor did it find that it operated to prevent the union from effectively reaching respondent's employees with its pro-union message.

On review of the record, we are satisfied it establishes respondent's no-distribution rule, promulgated some six years before the critical events at issue in 1957, was premised on its desire to "serve production, order and discipline" and further that it fails to establish that "the opportunities for effectively reaching the employees with a pro-union message, in spite of a no-solicitation rule" were not "at least as great as the employer's ability to promote the legally authorized expression of his anti-union views." National Labor Relations Board v. United Steelworkers of America, supra. [357 U.S. 357, 78 S.Ct. 1271.]

As earlier stated, Plant No. 1 faces on two highways and has "good broad sidewalks" "within a few feet of the plant" and "there is plenty of room for distributing pamphlets or doing anything you want"; it is located in an urban area in the city of Du Bois and "practically all" of its employees live in that city (the quotations are from the testimony of Lamar Puyda, a pro-union employee and Board witness).

Further, Vernon C. Shaffer, a pro-union employee and Board witness, testified that anti-union employees were also engaged in distributing their literature outside the respondent's plants; "there were a lot of employees there that didn't want this [pro-union] literature"; "there was a pretty strong feeling against the union as well as for it."

Shaffer's testimony as to the existence of strong anti-union sentiment on the part of a "lot of employees" corroborated that of Earl Hudson, respondent's general manager. The latter testified that he posted the long-standing no-distribution rule on respondent's bulletin boards because he wanted to "prevent fisticuffs and altercations" on respondent's property because of the strong pro-union and anti-union feelings prevailing among employees.

The testimony adverted to was uncontradicted by any of the Board's other witnesses and served to support respondent's contentions that it enforced its no-distribution rule to maintain order.

It is unquestioned that had respondent permitted distribution of pro-union literature on its parking lot it would, under the law, have been required to permit distribution of anti-union literature creating, under the testimony, the disorders sought to be avoided by enforcement of the no-distribution rule.

Without spelling out the foregoing, the trial examiner in his Intermediate Report recommended the dismissal of the complaint insofar as it dealt with the respondent's no-distribution rule. In doing so he stated:

"On the entire record the undersigned * * * finds that a rule intended to prohibit distribution of all literature at the plant unless specifically authorized existed since 1951.

\*    \*    \*    \*    \*    \*

"Upon the entire record the undersigned is persuaded that the Respondent did not 'on February 8, 1957, and thereafter, discriminatorily promulgate and enforce a rule denying its employees the right to distribute any literature on its property, including parking lots and other areas adjacent to the buildings comprising the plants of its DuBois plants'."

In accordance with the foregoing we are of the opinion that the Board's petition for enforcement with respect to its order relating to the no-distribution rule must be denied.

Coming now to the second phase of the Board's petition for enforcement based on statements and questions addressed by respondent's supervisory employees to certain pro-union employees:

As earlier stated, the trial examiner in his Intermediate Report dismissed charges that unfair labor practices were committed with respect to verbal exchanges between the supervisory employees with pro-union employees Youngren, Case and Lenkerd. With respect to the incidents in which Youngren and Case figured the trial examiner stated he was persuaded they represented "only isolated chance inquiries by the foreman not chargeable as an unfair labor practice", and as to the Lenkerd conversation he stated that "the General Counsel's dredging produced no gold."

The Board disagreed with the trial examiner and found " * * * in the context of the Respondent's admitted hostility to the Union, as manifested in the general manager's speech of February 5, 1957, and its unlawful prohibition of the distribution of union literature on the company parking lot by employees, at the inception of the union's organization campaign, the remarks of the foreman to Youngren, Case and Lenkard were coercive and violative of Section 8(a) (1) of the Act."

An analysis of the verbal exchanges referred to sustains the finding and recommendation of the trial examiner and negates the Board's determination.

Youngren testified with respect to his conversation with Foreman Hoskavich as follows:

"Q. Now, what did Mr. Hoskavich say to you? A. He said 'Verne, be careful. I heard that you are one of the instigators of this union trying to get in here.'

"Q. What did you say to him? A. I thanked him.

"Q. That was all? A. That was all."

Case testified as follows to the incident in which Foreman Hoskavich also figured:

"Q. And in the year 1957 have any of your supervisors made any comments to you about unions? A. Mr. Hoskavich asked us what our opinion was of the union. That was all.

*  *  *  *  *  *

"Trial Examiner: Just a minute. You say Mr. Hoskavich addressed a group of you.

"The Witness: The ones that were working there.

"Trial Examiner: How did that happen. Did he call you together or what?

"The Witness: We were all together there at quitting time, and he just asked us our opinion of the union.

"Trial Examiner: He just came up to you and asked you?

"The Witness: He came through where we had been working."

Two other employees who were in this group also testified that Hoskavich "asked us what we thought of the union."

Lenkerd testified as follows with respect to remarks made to him by Foreman Domitrovich:

"Q. Now, will you tell the Trial Examiner what Mr. Domitrovich's remark about the unions was, and the events, if any, leading up to such a remark? A. This was over a tow motor deal, a tow motor operator was stacking meters over where we hang our coats, and they were so close that this tow motor was rubbing on our jackets. I stepped across the aisle to him and told him what was coming off, and he followed me back to the machine, and he was sort of hot under the collar, and he said 'Since this union business got in here', he said, 'everybody gets hot real quick', and I said 'Well, as big a company as Rockwell is, they ought to have a place big enough to hang your coats so the tow motor don't rub over them and get them all dirty.' He said, 'Well, you are lucky you are working. You are lucky you are working.' He said 'If the union wasn't—

"Q. Take your time. A. 'If the union was in', he said 'you wouldn't

be working now. We are making meters for stock'. He said, 'You don't think you would be making meters for stock?'"

With respect to Foreman Hoskavich's admonition to Youngren to "be careful" it should be noted that the foreman testified that after it took place he "rode home with [Youngren] the same night", and that Youngren frequently "rode me home" from work.

While such an admonition could under certain circumstances be adjudged a "threat" violative of the Act, due consideration must be given to the fact that the trial examiner who heard the testimony and observed the demeanor of the witnesses and took note of the friendliness of their relationship, evidenced by their riding home together from work, found that it was not, and his finding merits consideration by this Court. The same holds true with respect to the trial examiner's finding as to the Case and Lenkerd incidents.

As we stated in In re United Corporation, 3 Cir., 1957, 249 F.2d 168, 178 in discussing the holding in Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, "* * * while a reviewing court need not give a trial examiner's findings more weight than they deserve in the light of reason and judicial experience, they should be accorded the relevance that they reasonably command in answering the over-all question whether the evidence supporting the Board's order is substantial."

To the same effect see National Labor Relations Board v. Supreme Bedding & Furniture Mfg. Co., 5 Cir., 1952, 196 F. 2d 997 where it was found that the recommendations of the examiner were supported by substantial evidence while the findings of the Board were not and enforcement of the Board's order was ac-

cordingly denied. In that case the Court stated (196 F.2d at page 997): "* * * the Board is unable to make use of, the tributes to the perspicuity and the superior opportunities of the examiner * * *" and stressed (p. 998) "* * * the examiner's superior opportunities to determine the credibility * * *."

Considering the statements made here, each is either permitted as (1) a noncoercive interrogatory, National Labor Relations Board v. McCatron, 9 Cir., 1954, 216 F.2d 212 certiorari denied 1953, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738 and cases cited there; Sax v. National Labor Relations Board, 7 Cir., 1948, 171 F.2d 769; (2) a vague warning not coupled with a threat of reprisal, National Labor Relations Board v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848, 853 note 7 (statement to employee that he would be hurt by his union activities); or (3) a prediction not coupled with a threat to use the employer's economic power to make the prediction a reality, National Labor Relations Board v. West Ohio Gas Co., 6 Cir., 1949, 172 F.2d 685, 688, and cases there cited; National Labor Relations Board v. Falls City Creamery Co., 8 Cir., 1953, 207 F.2d 820 ("You won't have as much work [with a union].").

The Board's attempt to hoist by its own boot-straps, so to say, its findings that the statements were violative of the Act by reason of the respondent's hostility to the union as evidenced by the general manager's speech must be assessed in view of its holding that the speech was "privileged" and not violative of the Act.

The Act (§ 8(c)) specifically provides that privileged communications "* * * shall not * * * be evidence of an unfair labor practice. * * *"[20]

■ Nor is hostility to a union, or "antiunion bias" an unfair labor prac-

20. Indiana Metal Products Corp. v. National Labor Relations Board, 7 Cir., 1953, 202 F.2d 613; Pittsburgh Steamship Co. v. National Labor Relations Board, 6 Cir., 1950, 180 F.2d 731, affirmed 1951, 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479. See also National Labor Relations Board v. United Steelworkers of America, 1951, 357 U.S. 357, 365, 371, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (concurring opinion).

tice. National Labor Relations Board v. McGahey, 5 Cir., 1956, 233 F.2d 406, 409.

In accordance with what has been said we are of the opinion that the Board's petition for enforcement of its order with respect to the respondent's supervisory employees' conversations with its pro-union employees must be denied.

For the reasons stated the Board's petition for enforcement of its order will be denied.