KORN INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Union, United Furniture Workers of America, AFL–CIO, Intervenor.

No. 11041.

United States Court of Appeals Fourth Circuit.

Argued April 3, 1967.

Decided Dec. 11, 1967.

Karl W. McGhee, Wilmington, N. C. (Ellis L. Aycock, and Stevens, Burgwin, McGhee & Ryals, Wilmington, N. C., on brief), for petitioner.

Alan D. Eisenberg, Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and George B. Driesen, Attorney, N.L.R.B., on brief), for respondent.

Martin Raphael, New York City, for intervenor.

Before SOBELOFF, BRYAN and BUTZNER,* Circuit Judges.

BUTZNER, Circuit Judge:

This case is before the court upon Korn Industries' petition to review and set aside an order of the National Labor Relations Board and the Board's cross petition to enforce its order. The first question is whether the company refused to bargain in good faith by:

(a) unilaterally instituting, without first bargaining to impasse during ne-

* At the time this case was submitted, Judge Butzner was a District Judge sitting on this Court by designation.

gotiations, a wage system which included a general wage increase and a merit plan rating;

(b) refusing to furnish the union relevant information relating to the wage system, job standards, and performance records of employees;

(c) informing its employees that the presence of the union would not affect wage policies in any way.

■ The trial examiner found for the company on all issues. The Board disagreed. It concluded that the company violated Section 8(a) (1) and (5) of the Act.[1] We hold substantial evidence supports the Board's finding that the company refused to bargain in good faith by unilaterally instituting a general wage increase and a merit plan. The Board's findings on the other issues are not supported by substantial evidence.

■ The second question pertains to the discharge of Charles W. Campbell, an employee, for distributing union literature in the doorway of the plant building. The trial examiner found that the company's no-distribution rule was a valid fire prevention measure and that Campbell's discharge was lawful. The Board concluded that the rule was invalid and consequently Campbell's discharge was an unfair labor practice within the meaning of Section 8(a) (1) and (3)[2] of the Act. We hold the evidence is insufficient to sustain the Board's decision.

The union, after being certified in 1963, entered into a one year contract that expired in February, 1965. The union then gave notice of its intention to renew and modify the agreement. The company filed a petition for an election which was held June 2, 1965. The employees voted to retain the union as bargaining representative. A bargaining session was scheduled for June 30, 1965.

On June 26, 1965 the company's attorney informed the union's representative that the company had prepared some material to comply with Title VII of the Civil Rights Act,[3] which was to become effective July 2, 1965. The attorney asked the union's representative to review the company's proposal before the June 30 bargaining session. On June 28 the union's agent received a three page "Explanation of Job Evaluation and Category System" and a thirty-four page document that classified employees by name into nine separate job categories. The company established a minimum and maximum wage scale for each category. Employees with more than eight months' service were granted a five cents an hour increase. Employees in several other categories received larger increases. The plan also provided for evaluation of em-

---

1. National Labor Relations Act § 8(a) (1) (3) (5), as amended, 29 U.S.C. § 158(a) (1) (3) (5):
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   \*   \*   \*   \*   \*
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*
   "(5) to refuse to bargain collectively with the representatives of his employees, \* \* \*"
   29 U.S.C. § 157:
   "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title. July 5, 1935, c. 372, § 7, 49 Stat. 452; June 23, 1947 c. 120, Title I, § 101, 61 Stat. 140."

2. 29 U.S.C. § 158(a) (1) and (3), note 1 supra.

3. 42 U.S.C. § 2000e–1, et seq.
   The act prohibits discrimination because of race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a) (1).

ployees for wage increases as stated intervals over approximately the next four years. The plan provided that the company could revise the job classifications from time to time as conditions warranted.

At the June 30 bargaining session both the company and the union submitted proposals for a new contract. The company requested union approval of the wage plan, asserting that it was designed to comply with Title VII of the Civil Rights Act and Section 6(d) of the Fair Labor Standards Act.[4] The company said that an investigation by the Wage and Hour Division of the Department of Labor disclosed the company's failure to comply with Section 6(d).

The company stated that after the plan went into effect bargaining would continue with regard to wages.

The union replied it was willing for the company to make any adjustments required by the Civil Rights and Fair Labor Standard Acts, but denounced the plan as providing a general wage increase coupled with merit increases on a periodic basis over the next four years or more. The union protested that these provisions of the plan should be the subject of bargaining along with other terms of the contract. The union's request that the plan be made subject to grievance and arbitration procedure was refused by the company.

During the bargaining session, the union referred to previous negotiations when the company granted a general increase of 10 cents an hour on the ground that the minimum wage law required an upward revision of pay scales. At that time the company declined to make any further concessions, and the union believed the company's action was disadvantageous to the union and its bargaining position. The union told the company that it did not want to be maneuvered into that kind of a position again. At this point the company attorney said "that union bargaining had never had any influence on wages in the plant and would not have any in the future."

To counter the criticism that the plan would be disadvantageous, the company stated the union could take credit for the good features of the plan. The union declined to do this. The company announced that it would put the plan in effect on July 2, 1965, which it did.

■■ It is settled law that an employer violates the duty to bargain collectively imposed by § 8(a) (5) of the Act when it institutes changes in subjects of mandatory bargaining under § 8(d) without first consulting a union with which it is carrying on bona fide contract negotiations that have not yet reached an impasse. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Substantial evidence supports the Board's finding that the company alone, without negotiation, consultation, or conference with the union, planned a general wage increase and a system for evaluating employees and awarding additional merit increases over a period of approximately four years. This plan was made known shortly before the bargaining sessions began, and at the first bargaining session the company announced that it would put it into effect within three days with or without the consent of the union. The finding of the Board that the company would not provide information on the criteria for the merit increases emphasizes the lack of consultation. The company's plea that it had no information to supplement its plan provided a defense to a separate charge of unfair labor practices, but it did not excuse the company's failure to consult and negotiate with the union.

In NLRB v. Katz, 369 U.S. 736, 745, 82 S.Ct. 1107, n. 12 (1962), the Court observed that an employer did not violate the Act when, after notice and consultation, it "unilaterally" instituted a wage increase identical with the one which the union has rejected as too low, citing NLRB v. Bradley Washfountain Co., Inc., 192 F.2d

---

4. 29 U.S.C. § 206(d), forbidding disparate pay rates for men and women doing the same work.

144, 150–152 (7th Cir. 1951), and NLRB v. Landis Tool Co., 193 F.2d 279 (3rd Cir. 1952). However, neither case factually resembles the situation the Board found at Korn, and the principles they express are not controlling.

In *Bradley Washfountain* the union had requested 16 cents and pay for holidays. The parties had bargained over this request. The company, after notice to the union, allowed 15 cents and part of the relief prayed as to pay for holidays. In holding that the company did not commit an unfair labor practice, the court pointed out that its action was not unilateral—that, on the other hand, it was compliance with the request of the union to the extent made.

In *Landis Tool Co.* the company allowed an increase of 7 cents an hour to 15 pattern makers with whose union it was currently bargaining at the same time that the wage increase was allowed to some 900 other employees in the plant. The court emphasized that the plant's over-all increase was granted the pattern makers in accordance with an understanding reached by the union and the company.

In neither case was the wage increase made without prior consultation and negotiation with the union in bargaining sessions on the issue of wages, and in neither case did the company attempt without consultation and negotiation to institute a merit plan.

Korn's wage increase was inextricably linked with its merit system for evaluating employees and awarding additional increases over a period of approximately four years. Bargaining does not take place in isolation and a proposal on one point serves as leverage for positions in other areas. Had the union been offered an opportunity to consult and negotiate with the company on the wage increase, it could more adequately have responded with counter proposals on the merit system and other matters. The interdependence of issues in a bargaining situation is recognized in NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 223, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949):

"In the instant case, the wish of the employees to be consulted and to bargain collectively as to the terms of any general wage increase is established by the findings and the negotiations. * * * We do not have here a case where the bargaining had come to a complete termination cutting off the outstanding invitation of the certified collective bargaining representative to bargain as to any new issue on such a matter as rates of pay. * * * The opening which a raise in pay makes for the correction of existing inequities among employees and for the possible substitution of shorter hours, vacations or sick leaves, in lieu of some part of the proposed increase in pay, suggests the infinite opportunities for bargaining that are inherent in an announced readiness of an employer to increase generally the pay of its employees. The occasion is so appropriate for collective bargaining that it is difficult to infer an intent to cut off the opportunity for bargaining and yet be consistent with the purposes of the National Labor Relations Act.

"We do not here have a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations. Such a grant might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as a unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations."

Crompton-Highland Mills' increase in pay was more generous than that which it had offered in negotiations. In *Korn* the increase in pay was in effect more generous, for the company had made no offer, but instead notified the union that it would put its pay increase into effect with or without the union's agreement. This is the antithesis of consultation.

Korn's unilaterally imposed merit system standing alone was an unfair

labor practice. This issue was decided in NLRB v. Katz, 369 U.S. 736, 745, 82 S. Ct. 1107, 1113 (1962), where the court said:

"The respondents' third unilateral action related to merit increases, which are also a subject of mandatory bargaining. [National] Labor [Relations] Board v. [J. H.] Allison & Co., [6 Cir.,] 165 F.2d 766, [3 A.L.R.2d 990.] The matter of merit increases had been raised at three of the conferences during 1956 but no final understanding had been reached. In January 1957, the company, without notice to the union, granted merit increases to 20 employees out of the approximately 50 in the unit, the increases ranging between $2 and $10. This action too must be viewed as tantamount to an outright refusal to negotiate on that subject, and therefore as a violation of § 8(a) (5), unless the fact that the January raises were in line with the company's long-standing practice of granting quarterly or semi-annual merit reviews—in effect, were a mere continuation of the status quo—differentiates them from the wage increases and the changes in the sick-leave plan. We do not think it does. Whatever might be the case as to so-called 'merit raises' which are in fact simply automatic increases to which the employer has already committed himself, the raises here in question were in no sense automatic, but were informed by a large measure of discretion. There simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice, and therefore the union may properly insist that the company negotiate as to the procedures and criteria for determining such increases."

Despite the admonition in *Katz* that the union may properly insist that the company negotiate for the procedure and criteria for determining merit increases, Korn refused to do so, even after it had offered to continue negotiations with the wage plan in effect. On August 13, more than thirty days after the merit system had been placed in effect, the union made a written request for certain items of information relating to the job descriptions and the new wage system. The company attorney stated the request was "silly" because he had already given the union the information. The union representative acknowledged that the company gave him a list of the employees, their hiring dates and their wage rate, but protested the company gave no information or data that was used by the company to put empolyees in certain groups, and nothing about the content of the jobs involved in the groupings. To this the company attorney responded that the union representatives were familiar with the furniture industry and that " * * * if there is anything you don't know you can ask the employees."

At this same bargaining session the union pressed its objection to the merit system because it left the question of wages solely to the discretion of the company for a period of about four years and neither the union nor the employees would have recourse to what the company did in the matter of wages. To this objection the company's attorney replied, "Oh yes, there is a recourse if an employee doesn't get a raise, he can ask us and we will tell him why."

There is substantial evidence for the Board's finding that Korn's institution of the wage increase and merit system was in bad faith and in derogation of its duty to bargain. Not only did the company make the change without conferring in good faith with respect to wages and conditions of employment, but it also persisted in its refusal to furnish meaningful information upon which consultation could be based after the system went into effect.

The Board was not required to accept the company's unsupported contention that its wage plan was necessary to comply with the Civil Rights Act and the Fair Labor Standards Act. An across the board hourly increase and a merit system extending over a four-year period could be considered by the Board as ir-

relevant to the requirements of the laws to which the company referred.

Furthermore, the Board found that seven months after the company unilaterally instituted the wage system the company attorney proposed a revision of still further wage increases in order to comply with the Civil Rights Act. When the union representative asked why it was necessary to make further changes to effect compliance, the company attorney mentioned as one of the reasons, "employees were leaving for better jobs and the company needed to put in another increase to stop people from leaving the factory." The Board was justified in drawing the inference that the company's unilateral action on wages was not limited to the requirements of the Civil Rights Act.

The Board found the company also violated the Act by failing to furnish the union relevant information about the new wage system, job standards and performance records of employees.

■ An employer must provide relevant information to union representatives so that they can bargain effectively. NLRB v. Whitin Machine Works, 217 F.2d 593, 594 (4th Cir. 1954), cert. denied 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). But it cannot be required to furnish information which is not available to it. NLRB v. United Brass Works, Inc., 287 F.2d 689, 697 (4th Cir. 1961). The uncontradicted evidence shows that the company furnished all the information it had about its new plan. This information was less complete than the Board deemed necessary. The absence of detailed information is consistent with the company's explanation that the plan was hurriedly made. This might reflect upon the plan, but the paucity of the data does not establish that other information was available.

The Board's finding on this issue is not supported by substantial evidence.

■ The Board found the statement made by the company attorney that " * * * union bargaining had never had any influence on wages in that plant and would not have any in the future," tended to interfere and restrain employees in the exercise of their § 7 rights and thereby violated § 8(a) (1).[5] The Board also found the statement evidenced an intention not to bargain in good faith.

The statement was made at a bargaining session during the dispute over merits and reasons for the unilateral wage plan. No doubt the Board was justified in considering the statement as evidence disparaging the company's claim that its wage plan was a bona fide effort to comply with the Civil Rights Act and Fair Labor Standards Act. The evidence, however, does not sustain the Board's finding that the statement tended to interfere and restrain employees in the exercise of their § 7 rights.

■ Under other circumstances the statement might violate the Act.[6] But here, within the context of the bargaining session at which the statement was made, it cannot be considered an independent violation. It was simply a part of the argument that centered on the improper wage plan. The division of one violation of the Act into many violations should not be encouraged. Nor should the Board, or courts, inhibit discussion at the bargaining table by imposing a penalty based upon isolated statements made in the heat of argument. Cf. NLRB v. Frontier Homes Corp., 8 Cir., 371 F.2d 974 (1967).

■ We reject the company's suggestion that its wage plan did not violate the Act because of the good faith character of its negotiations. The Board can conclude an employer's unilateral in-

5. 29 U.S.C. § 157 and 29 U.S.C. § 158(a) (1). The text is in note 1 supra.

6. The cases upon which the Board relies concern organizational activities. E. g., NLRB v. Griggs Equipment, Inc., 307 F.2d 275 (5th Cir. 1962); NLRB v. Flem-ingsburg Manufacturing Co., 300 F.2d 182 (6th Cir. 1962); NLRB v. Wigwam Mills, Inc., 351 F.2d 591 (7th Cir. 1965), enforcing 149 NLRB 1601; May Department Stores Co. v. NLRB, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945).

stitution of a wage plan during negotiations violates § 8(a) (5) without finding subjective bad faith at the bargaining table. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107 (1962). Failure of the company's defense, however, does not rest solely on *Katz*. Several elements—the lack of substance to the claim that the wage plan was designed to comply with new legislation, the paucity of information concerning it, and the company attorney's comment on the union's ineffectiveness—combine with the unilateral institution of the plan to provide substantial evidence for the Board's decision that the company failed to bargain in good faith.

## II

The Board found that the company engaged in unfair labor practices within the meaning of § 8(a) (1) and (3) of the Act by discharging Campbell for violating a rule that prohibited the distribution of literature. The Board held that the enforcement of this rule was in itself an unfair labor practice within the meaning of § 8(a) (1) of the Act.

The rule provides:

"Distribution of literature: Good housekeeping on the premises contributes to safe working conditions and quality work. In order to maintain good housekeeping, the distribution on the premises by anyone of any literature, pamphlets, or handbills will not be permitted except as made by Korn Industries in aid of is operations."

Campbell violated this rule on four occasions. In the latter part of August, 1965, he was observed distributing union literature in the doorway of the factory to employees entering the factory. The plant superintendent read the rule to him, explained the rule, and verbally warned him not to violate it again. On September 17 and October 13, Campbell violated the rule by distributing literature at the same place. On these occasions he was given written warnings. A notation on the first of these warnings indicated that the business agent of the union had been consulted by the company. The agent had told the company that he would see that it did not happen again. The superintendent told Campbell that if he violated the rule again he would be discharged.

On October 21, Campbell again distributed union literature in the same place, and was discharged.

The doorway where Campbell distributed the literature was a nonworking area of the plant. It opened upon a hallway that led to a machine shop about 12 feet away. The main working area was 30 or 40 feet distant.

A rule prohibiting employees from distributing union literature on their own time, in nonworking areas of the employer's plant, is presumptively invalid. Lack of an anti-union motive is immaterial. Such a rule only can be upheld on a showing that special circumstances make the rule necessary to maintain production or discipline. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); NLRB v. Lexington Chair Co., 361 F.2d 283 (4th Cir. 1966); Peyton Packing Co., 49 NLRB 828, 843 (1943). The Board applied this presumption in reaching its decision that the rule was invalid and Campbell's discharge was unwarranted.

Company officials testified the purpose of the rule was to insure good housekeeping and safety of the plant with respect to fire and other hazards. The rule was made about 1954. Fires had damaged the plant in 1942 and 1952.

Although the rule on its face applied throughout the company's premises, it was not interpreted by the company or its employees as broadly as it was written. Union members distributed literature in the parking lot area of the company's premises without interference by the company. Enforcement of the rule was confined to the factory area.

The rule also was subject to another exception which, permitted union litera-

ture. The contract between the union and the company provided in Article 8:

> "The company shall erect a bulletin board in the hallway near the time clocks for the exclusive use of the union provided however that all notices so posted will be signed by an officer of either the Local or International union."

The bulletin board was maintained with the exception of a short time when it was obstructed by a drink machine while a lunch room was remodeled. It was not obstructed at the time Campbell was discharged.

The Board attached no significance to the fact that distribution of union literature was permitted on the company parking lot and that a bulletin board was maintained for the exclusive use of the union. General Counsel took the position that the non-distribution rule is invalid even if there are other available means of communication among the employees or between the employees and the union. He relied upon NLRB v. United Aircraft Corp., 324 F.2d 128 (2d Cir. 1963), cert. denied 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964), which held that the Board need not consider alternative means of communication in applying the presumption of invalidity. On this question the circuits differ. Contrary conclusions were reached in Republic Aluminum Co. v. NLRB, 374 F.2d 183 (5th Cir. 1967) and NLRB v. Rockwell Mfg. Co., 271 F.2d 109 (3rd Cir. 1959). The issue presented by these cases, however, is not squarely before us for decision. In NLRB v. United Aircraft Corp., 324 F.2d 128 (2d Cir. 1963), cert. denied 376 U.S. 951, 84 S.Ct. 969 (1964), the company rule prohibited distribution of union literature in non-working areas of the company's premises. Under these circumstances, the court pointed out, the alternatives were distribution through the mail, newspaper advertisements, television and radio, and on public sidewalks and street corners.

The factual situation before us is different. The company's position is not dependent upon off-plant distribution as an alternative to in-plant distribution. The uncontradicted evidence discloses that the company allowed in-plant distribution on its parking lot and by means of the union bulletin board which the company maintains near the time clock. The company prohibited distribution of literature only in the factory area.

We believe that the company's distribution rule and practices, along with the contractual provision allowing a union bulletin board,[7] must be viewed together. When all of these elements are considered it is apparent that the company did not flatly prohibit distribution of union literature on its premises. The union offered no evidence that the limitation upon distribution in the factory area was not for purposes of good housekeeping, safety and fire prevention. The evidence demonstrates that special circumstances do exist justifying the company's regulations. The rule which Campbell violated was valid. Campbell's discharge was lawful.

We conclude that those portions of the Board's order which refer to the unilateral change in wages and the refusal to bargain concerning wages should be enforced.[8] In all other respects enforcement of the Board's order is denied.

Enforcement ordered in part and denied in part.

ALBERT V. BRYAN, Circuit Judge (dissenting in part):

The decision today really comes to this: a unilateral, i. e. a voluntary, increase of wages and other benefits cannot be granted, even after consultation with the union, until the union assents; until then the award constitutes a refusal to bargain.

My point is that after notice, consultation or negotiation the increase does not have to await agreement by the

---

7. In Armco Steel Corp. v. NLRB, 344 F. 2d 621 (6th Cir. 1965), the court upheld a contractual provision limiting union distribution to bulletin boards.

8. Paragraphs 1(a), (b) and 2(a), (b) of the Board's order of November 10, 1966.

union. The Court's opinion itself, I think, proves these prerequisites were observed.

If, nevertheless, bargaining must follow, as the Court holds, the immediate query is: bargaining on what? With an increase assured, obviously the only issue remaining is the defeat or shrinkage of the raise. Had the parties engaged in this fantastic, negative pursuit, it would have been a hypocritical farce.

Imagine bargaining to an impasse on the union's disapproval of the increase. Picture the union thumping the table against the benefits, and the utter sham of the union's contention is exposed. How long it may thus postpone the employee benefits is not disclosed.

The union also argues, as paraphrased by the Court, that the merit system offered by the company "left the question of wages solely to the discretion of the company for a period of about four years and neither the union nor the employees would have recourse to what the company did in the matter of wages". Unless the union agreed to it, how wages could be fixed exclusively and incontestably by the company is inexplicable. Concededly, the merit system always remained open to bargaining.

Truth is, as the Board's examiner stated—and all of these aerial arguments of the union confirm—the union is only seeking to maintain its prestige. This is made quite evident by the following incidents. First, there is this colloquy in the hearing before the examiner:

"Trial Examiner: You told him you didn't want him to increase the employee's wages?

"The Witness: [Williams]: Yes sir, a general increase."

Dominance of union self-interest is also manifested in the Board's explanation in its brief that "Williams also objected to the proposed periodic increases because the plan precluded the Union from playing a part in those determinations."

Any thought that the company was attempting to undermine union stature is at once dispelled on recalling that the offer was not released to the employees but was first submitted to the union. Further, the company offered to let it be treated as procured by the union.

I. The enlargement of wages and benefits (designated infra simply as benefits) after consultation with the union is an employer's untrammeled right. It is something, it has been authentically declared, to be encouraged. In the same ex cathedra declaration it is held to be innocent of the imputation of union disparagement. Subordination of the worker's interest to the glorification of the union by allowing it to veto or delay the benefits is untenable. Thus the majority opinion collides, head and head, both with the welfare of the worker and, as will appear, the highest authority.

In NLRB v. Crompton-Highland Mills, 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949), the Court said:

"We do not here have a *unilateral* grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations. Such a grant might well carry no disparagement of the collective *bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed* by the bargaining representative, without prejudice to the rest of the negotiations." (Accent added.)

In NLRB v. Katz, 369 U.S. 736, 745, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962) while disapproving a bestowal of wage and other benefits without notice or consultation with the union, the Court distinguished as valid a grant made via the union, explaining:

"Of course, there is no resemblance between this situation and one wherein an employer, after notice and consultation, '*unilaterally*' institutes a wage increase identical with one which the

union has rejected as too low." (Accent added.) [1]

II. If Korn Industries did in fact notify, consult or negotiate with the union upon the company's proposal to confer the employee-benefits, of course the refusal to bargain conviction cannot stand.

Completely reversing its examiner the Board, and now the Court, put decision on the finding that the company "unilaterally instituted" the benefits. But, as the authorities just quoted declare, there is nothing wrong with a unilateral award if it is preceded by notice, consultation or negotiation. In any event, suicidal of the decisional premise here is the majority's own refutation of it. Despite sincere deprecation, the opinion conclusively demonstrates that there was notice, consultation, and negotiation prior to the company's effectuation of its plan.

The following facts, undenied, are merely introductory to the Court's findings. The last annual contract existing between the union and the company since 1963 expired in February 1965. Before then, the union gave notice it desired to modify the contract. One June 2, 1965, after the union's election that day as bargaining agent, its representative advised the employer's attorney that "the check off would be an important issue in the negotiations".

The following is a summarization of the majority's findings and, in my judgment, conclusively establishes that the benefit increase was the subject of notice, consultation and negotiation between Korn and the union.

(1) A bargaining session was set for June 30th. Four days ahead, on June 26th, the company's attorney notified the union that the company had prepared a contract proposal for presentation at the meeting. On June 28th the proposal, assertedly prepared mainly to satisfy the wages and hours requirements of the Civil Rights Act, 42 U.S.C. 2000e–1 et seq., was handed the union alone, without word to the employees. It was a detailed classification of the employees into job descriptions and categories, a minimum and maximum wage schedule for each class, with a present grant of increases and provision for future raises according to later evaluation of the employees.

(2) At the June 30 bargaining session the employer and the union, as the majority faithfully notes, each offered terms for a new contract. The union protested the company's contemplated promulgation on July 2 of the company's wage-benefit plan. In this debate the union adverted to a prior contract when the company before *negotiations* put an increase of 10 cents per hour into effect and thereafter refused to make other concessions on wages. The union argued that this action hurt its standing with the employees. The same course was avoided instantly.

(3) Still another contention asserted by the union was that the Civil Rights Act did not compel a wage and hour adjustment by July 2. The company asserted the contrary.

(4) Then the company offered to let the union be credited with the good features of the company plan. The union rejected the tender.

(5) Additionally, in the same gathering the union urged an eight-point modification of the prior contract. Especially, it requested the inclusion of a grievance-arbitration clause. The company declined.

(6) Also, as the majority states, "[A]t this same *bargaining* session the union pressed its objection to the merit system" and gave its grounds.

(7) Likewise, a statement was made "at a bargaining session during the dis-

1. The Court cited NLRB v. Bradley Washfountain Co., 192 F.2d 144, 148, 150–152 (7 Cir. 1951). There the Seventh Circuit Court of Appeals reversed the Board's conclusion, contrary to that of its examiner, that the employer was at fault for upping wages during negotiations to the level offered the union but not acted upon by it.

pute over merits and reasons for the unilateral wage plan" by the company attorney which was found by the Board to be an impeachment of the employer's bona fides. "It was simply a part of the *argument* that centered on the improper wage plan", the majority labels it. (All accents added.)

Leaving the majority opinion for a moment, the record reveals pointed testimonial corroboration of these employer-union exchanges. Williams, the union representative, testified that at the June 30 meeting the company's attorney, "asked if he might present to us and explain in detail these plans. McGhee [company attorney] did explain the plan and *asked for permission for him to put it into effect*". Williams continued, "I asked him not to put in any wage increases that were not required under the law". (Accent added.)

Thus, even without the collateral record excerpts, the majority opinion explicitly and implicitly recognizes there was union-employer controversy as to the benefits and that these controversies were fully and vigorously aired "during the bargaining session". This is an apt and accurate description by the Court of the occasion. The examiner epitomized it in these words: "* * * the parties bargained, made offers and counter-offers, and in every respect satisfied the established criteria of bargaining deportment". Just how much more was necessary to constitute notice, consultation and negotiation is not readily conceivable.

If the contrary conclusion of the Board is a finding of fact, then clearly it is wanting in substantial evidential support and must be disregarded. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

III. The Board and the Court would erase the *fact* of notice, consultation and negotiation in June 1965 by asserting the company was not acting in good faith.

Foundations for this allegation are, first, that the company declined to furnish the union with information relating to the job descriptions and the new wage system. Infusion of this contention as tainting the company's conferences on June 30th and the benefits' augmentation on July 2, 1965, is somewhat unclear. The information episode did not arise until August 13 and could hardly have affected the events of almost six weeks previous.

But the whole completely collapses when the Court finds, and quite soundly, that since "the uncontradicted evidence shows that the company furnished all the information it had about its new plan * * * the Board's finding on this issue [of failure to furnish] is not supported by substantial evidence."

Next, there is reference to the statement by the company attorney, supra, which was said to be an unjustified stricture upon union persuasiveness. Thereafter, the opinion holds the remark was not a Section 7 Act violation, saying: "Nor should the Board, or the courts, inhibit discussion at the bargaining table by imposing a penalty upon isolated statements made in the heat of argument." The Court thus recognizes it for what it was—a part of the bargaining on June 30—and exonerates it as fair comment. How then could it be counted to show an absence of good faith?

Also, bad faith is attributed to the company in that seven months after the award of the benefits of July 2nd, "the company attorney proposed a revision of still further wage increases". Here again the proposal was not related to the company's behavior on June 30. Furthermore, it was directed to the *union*, obviously denoting consultation and compliance with the union's present thesis.

If reliance to establish bad faith is put, as the majority would, on the failure of the company's plea that the benefits were needed to fulfill the exactions of the Civil Rights Act, it is a weak reed indeed. If the benefits were not exacted by the Civil Rights Act, at least company counsel thought they were and so contended in the hearing. I see no warrant for the accusation in the brief of the Board that counsel's averment was a "falsehood". The position may have been

a mistaken one, but the loss of a defense is not proof of bad motive, personally or objectively. If it were, then every unsuccessful defendant could be so impugned. Fraud is readily charged; not proved, it hurts the accuser more than the accused.

IV. Incomprehensibly, throughout this case the union is everywhere objecting to remunerative advances for employees. It confirms the examiner's characterization of the union's attitude —to aggrandize itself at the expense of the employees.

On the Board's assertion of unilaterality, its decision comes to this. If the company had merely withheld word of an increase until it was demanded by the union, there would have been no affront to the bargaining process. Spontaneity was the sin; the union's preeminence was slighted.

I dissent from those portions of the majority opinion enforcing the Board's order.