**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HISTORIC SMITHVILLE INN and Quail Hill, Respondent,**

**Hotel, Motel and Restaurant Employees Union, Local 508, AFL–CIO, Intervenor.**

**No. 17503.**

United States Court of Appeals Third Circuit.

Argued June 3, 1969.

Decided July 18, 1969.

Nan C. Bases, N. L. R. B., Washington, D. C., for petitioner (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William F. Wachter, Atty., N. L. R. B., on the brief).

Richard H. Markowitz, Wilderman, Markowitz & Kirschner, Philadelphia, Pa., for intervenor.

Godfrey P. Schmidt, New York City, for respondent.

Before KALODNER, VAN DUSEN and STAHL, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case comes before us on application for enforcement of an order of the National Labor Relations Board (hereinafter "Board"). The Board found that the Company[1] violated § 8(a) (1), 29 U.S.C. § 158(a) (1), by unlawfully threatening, interrogating, and polling its employees, and by surveillance of their union activities.

On November 28, 1966, some of the Company's employees met with representatives of the Hotel, Motel, and Restaurant Employees Union[2] in Atlantic City, New Jersey. Certain employees, including Margaret Jackson whose discharge will be discussed below, then took Union cards for distribution to other employees. Following that first meeting, the Union held meetings for employees on November 30 and every night thereafter until December 7. These meetings were first held in a poolroom in Jo-Jo's Bar.[3] On December 1 and December 3, the Company's "coordinator," Mr. Miller, was present in the bar area at Jo-Jo's during the Union meeting. On December 3, the Union meeting was moved from Jo-Jo's to the Beachcomber Inn, where Mr. Miller also appeared.[4]

On December 2, the Union requested recognition as the employees' bargaining representative. The Company refused, asserting doubt about the Union's majority status. The Union called a strike and began to picket respondent on December 7. On December 18, the Company distributed a questionnaire entitled "Voluntary Statement By Employee"[5]

1. There are actually two separate corporate respondents which operate restaurants in Smithville, New Jersey, but we shall refer to them in the singular because they have common officers, ownership, directors, and a common labor policy.

2. Local 508, AFL–CIO.

3. The poolroom is separated from the bar area by a partition and is entered through an opening near the main entrance to the establishment.

4. In addition to Mr. Miller, Assistant Chef Hand visited Jo-Jo's on December 1 during the Union meeting.

5.

"VOLUNTARY STATEMENT BY EMPLOYEE

"Please remember that while your Employer asks you to sign and initial this form, you are under no obligation to do so unless you want to.

"I have been told by my Employer's representative that:

"1. The picketing Unions claim to represent a majority of the Smithville Inn Employees engaged in restaurant operations;

"2. The picketing unions want my Employer to regard the showing and counting of union application cards, heretofore collected by the picketing unions as proof of that claim;

"3. My Employer prefers a secret National Labor Relations Board election as the best way to prove whether Smithville Inn employees want or do not want a union;

"4. The picketing unions refused, from the beginning, and continue to refuse a fair, secret election conducted by the National Labor Relations Board as the method for proving their dubious claim and for ending the present picketing and strike;

"5. My Employer doubts the unions claim of majority support and regards signed, union-application cards as, in the circumstances, a most unreliable method of showing the choice of a majority of Smithville Inn Employees.

"As an Employee of the Inn who is deeply interested in the involved dispute between my Employer and the picketing unions and who has a stake in the outcome of the dispute, I have been asked by

to each employee in an attempt to poll them to determine whether they preferred a secret election conducted by the Board or a show of Union application cards to an impartial third party.

Charges of unfair labor practices were filed by the Union against the Company on December 5 and on December 9, 1966. General Counsel of the Board issued a consolidated complaint on April 3, 1967, alleging unfair labor practices in violation of § 8(a) (1) and (3) of the National Labor Relations Act. A hearing was held on May 16 and 17, 1967, before Trial Examiner George Bott, who, in a decision issued August 29, 1967, found the Company had engaged in unfair labor practices. On January 10, 1968, the Board issued its decision and order adopting the findings, conclusions, and recommendations of the Trial Examiner.

The issues are whether there is substantial evidence on the record as a whole to support the Board's findings that (a) the Company interfered with, restrained, and coerced its employees in the exercise of their statutory rights, in violation of § 8(a) (1) of the Act (29 U.S.C. § 158(a) (1)); (b) the Company discharged Margaret Jackson because of her Union activities, in violation of § 8

(a) (3) and (1) of the Act (29 U.S.C. § 158(a) (3) and (1)); and (c) the December 18 poll interfered with the employees in the exercise of their § 7 (29 U.S.C. § 157) rights.

We hold that there is substantial evidence in the record as a whole to support the Board's findings.

■ We can find no error in the Board's determination that the surveillance of Company employees interfered with and coerced the employees in the exercise of their self-organizational rights, in violation of § 8(a) (1). See N. L. R. B. v. Morris Fishman and Sons, Inc., 278 F.2d 792, 796 (3rd Cir. 1960); N. L. R. B. v. Rockwell Manufacturing Co. (Du Bois Div.), 271 F.2d 109 (3rd Cir. 1959). The Board's finding of surveillance is supported by the testimony of the Company coordinator, Mr. Miller, and by the testimony of the Assistant Chef, Mr. Hand.[6] From the facts related in their testimony, the Board could properly infer that Miller and Hand were present for the purpose of monitoring the employees' Union activities.

■■ There is no dispute that Margaret Jackson was chronically late for

---

management to state my preference *without fear or favor* and on a completely *voluntary* basis.

"I have marked my choice in the appropriate box below by putting my initials in that box:

☐ I prefer a secret election conducted by the National Labor Relations Board as the best way of showing whether a majority of Smithville Inn Employees want or do not want a union.

☐ I prefer a show of union application cards to some impartial third party as the best way of showing whether Smithville Inn Employees want or do not want a union.

"I sign and initial this form *freely* and *of my own volition* without any pressure or undue influence exerted upon me by any management representative or anyone else. My purpose is to inform my Employer how I, as an affected Employee, feel about the alternatives which cause the existing dispute between the Historic

Smithville Inn and the picketing unions. SUNDAY, DECEMBER 18, 1966

. . . . . . . . . . . . . . . . . . . . . .

PLEASE SIGN HERE"

6. Mr. Miller testified that he was present at Jo-Jo's Bar both on December 1 and on December 3 while the Union meetings were in progress. While that fact alone may be insufficient to establish surveillance of Company employees, additional testimony given by Mr. Miller supports the Board's finding. Mr. Miller had been a regular patron of Jo-Jo's until August or September of 1966; thereafter, he did not visit Jo-Jo's until the middle of November. Mr. Miller also testified that he may have been prompted to stop at Jo-Jo's on December 1 by a "certain amount of curiosity", and he "probably assumed" another meeting would be held Saturday, December 3, when he returned. In addition, when the Union meeting moved from Jo-Jo's to the Beachcomber Inn, Mr. Miller left the former and went to the latter. While at Jo-Jo's, he was

work while employed by the Company.[7] That fact alone could constitute a non-discriminatory basis for discharge, but if the discharge was motivated, even in part, by union activity, it is illegal despite the existence of adequate cause for firing her. See N. L. R. B. v. Barberton Plastics Products, Inc., 354 F.2d 66, 68 (6th Cir. 1965). Although the witnesses gave conflicting testimony,[8] we find that there was sufficient evidence to support the Board's finding that Margaret Jackson's discharge was, at least in part, due to her Union activity.[9]

We must consider the interests of the Company and the effect on the employees in determining the propriety of the poll. An employer may have a legitimate interest in polling his employees to determine whether a union demanding recognition actually repre-

---

in a position to observe those employees who attended the meeting.

Mr. Hand also testified that he visited Jo-Jo's on December 1 while the Union meeting was in progress.

7. Mrs. Jackson confirmed the Company's charge in the following testimony:

"Q. Were you late as charged by the Company?

"A. Yes, I was late."

Although she had a long history of being late, this defect did not increase during the period prior to her dismissal. She had been employed by the Company as a waitress for more than five years prior to her discharge on December 3, 1966, and she was admittedly a good waitress.

8. Some of the Company witnesses testified that the decision to discharge Mrs. Jackson was made because she was habitually tardy, and that the decision was made on November 28, two days before she claimed the Company first learned of her Union activity. Mrs. Jackson was not actually discharged until December 3. Mrs. Noyes, the co-possessor of the Company, explained that the lapse of time from November 28 to December 3 was occasioned by the advice of counsel, who told her not to discharge anyone until he arrived on December 3. Counsel testified that he gave such advice. The testimony of dining room manager Gruhle is not as precise. He recommended Mrs. Jackson's discharge "possibly in late November", but he was unable to specify the date on which he discussed the discharge with Mrs. Noyes. Mr. Gruhle could only recall that a period of days elapsed between the time he recommended Mrs. Jackson's discharge and the date she was discharged. Mr. Merrill, manager of the Smithville Inn, testified that the last time he recommended Mrs. Jackson's discharge was just before Thanksgiving in 1966 and Mrs. Noyes "wanted to think about it." He reported back to Mrs. Noyes on November 20 or 27.

The Trial Examiner, whose findings were adopted by the Board, did not credit this testimony of respondent's witnesses. He found that the Company was substantially motivated by union considerations in discharging Mrs. Jackson on December 3 on the basis of testimony that she attended the Union organizational meeting on November 28; distributed Union cards at the Smithville Inn in the presence of Mrs. Miller, Mrs. Noyes' sister; was searched for Union cards by Assistant Chef Hand on November 30; was seen at Union Meetings at Jo-Jo's and The Beachcomber Inn by coordinator Miller; introduced Mr. Hand to Union president Timperio no later than December 1; and was discharged contrary to the Company's custom by which an employee is permitted to finish out the week.

From this evidence, credited by the Trial Examiner, it was not illogical for the Board to infer that the decision to discharge Mrs. Jackson was made after November 28 and was based in some part on her Union activities.

9. In N. L. R. B. v. Buitoni Foods Corp., 298 F.2d 169, 174 (3rd Cir. 1962), we said:

"We observe * * * that where * * * contradictory reasons for the discharge of an employee are advanced, it is the responsibility of the Board to weigh the evidence and resolve the factual conflict. * * * There is clearly no obligation on the Board to accept at face value the reason advanced by the employer. The concurrent existence of an otherwise valid reason for the discharge of an employee does not preclude a factual determination that his discharge was discriminatory if it appears from a preponderance of evidence, and the reasonable inferences drawn therefrom, that the discharge was in fact motivated by the employer's opposition to the employee's union activities."

See, also, Hugh H. Wilson Corporation v. N. L. R. B., 414 F.2d 1345 (3rd Cir., July 3, 1969).

sents a majority of the employees or to defend itself against an unfair labor charge, but we must also recognize that the employee being polled may fear management reprisal for support of the union. Cf. National Labor Relations Bd. v. Essex Wire Corp., 245 F.2d 589, 592 (9th Cir. 1957). The test to determine legality of the poll, applicable when this case arose, was "whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act." Blue Flash Express Co., 109 N.L.R.B. 591, 593 (1954).[10] We hold that the Board's finding that the December 18 poll interfered with the employees in the exercise of their § 7 rights is supported by substantial evidence on the record as a whole.

The poll was taken against a background of unfair labor practices in the form of surveillance and the discharge of an employee because of union activity. The form on which the poll was taken clearly sought employee identification, both by signature at the end and by initials in the box indicating the alternative chosen. The Board also adopted the Trial Examiner's finding that inadequate assurances against reprisals were given. That finding is particularly apt where employees who have been exposed to certain unfair labor practices are then requested to fill out a form which seeks their identification and makes inquiry regarding their alignment with union or management.

The Board's order will be enforced.

10. While we apply the *Blue Flash* test on this record, we note that the Board has revised the criteria for judging legitimacy of interrogation in Struksnes Construction Co., Inc., 165 N.L.R.B. No. 102, 65 LRRM 1385, 1386 (1967), where it said:
"Absent unusual circumstances, the polling of employees by an employer will be violative of Section 8(a) (1) of the Act unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is

communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere."
We note the recent Supreme Court decision in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed. 2d 547 (1969), where the court cited with apparent approval the above-mentioned *Struksnes Construction Co.* decision.