NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MORRIS FISHMAN AND SONS, INC., Respondent.

No. 12986.

United States Court of Appeals Third Circuit.

Argued Dec. 7, 1959.

Decided May 13, 1960.

Melvin Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alfred Avins, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

James L. Price, Philadelphia, Pa. (Richman, Price & Jamieson, Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, Chief Judge, and KALODNER and STALEY, Circuit Judges.

BIGGS, Chief Judge.

This is a petition under 10(e) of the National Labor Relations Act, 29 U.S.C. A. § 160, to enforce an order of the National Labor Relations Board arising from alleged unfair labor practices committed by Morris Fishman and Sons, Inc. (Fishman), a Pennsylvania corporation engaged in the interstate business of

wool pulling and the sale of hides and raw wool.

The facts as found by the Board are as follows. Commencing about November 20, 1957, Local 30, Leather Workers' Union, attempted to organize Fishman's 24 employees. Within two days the Union had managed to sign up several employees, and there was discussion among the employees about the possibility of a strike in order to gain recognition for the Union. On November 22, one of Fishman's foremen, Matteo, discussed the Union with Rhem, a Fishman employee. After Rhem told Matteo that the Union was coming into the plant, Matteo asked Rhem, who had not yet signed a union card, to discover how many employees had already signed union cards. Rhem complied with this request and reported that he did not think that many employees had signed as yet. He also informed Matteo, at the latter's request, that the organizational activities were being led by two former Fishman employees, Albert DeFillippo and Nicholas Lochetto. During working hours, on November 25, Clinton Worthy, Sr., another Fishman foreman, told Henry Milliner, an employee, in front of other employees, that Fishman could not tolerate a union and the plant would close if the employees were unionized. Worthy further told Milliner that there would be two boxes next to the time-clocks the following morning to collect votes, presumably on the issue of unionization. Shortly thereafter, Worthy entered the employees' dressing room and requested the workers there to get to the plant early so that they could vote on whether or not they wanted the Union. He also told the men that "if they would get the Union in there * * * the plant would close down."

On November 25, three union representatives, Coyle, Brownstone, and DiVincenzo, came to the plant and spoke with Mathew Fishman, vice-president of Fishman and the plant manager. They demanded recognition of the Local and an immediate contract. Brownstone claimed that a majority of the employees were enrolled in the Union but stated that he would only show the union-authorization cards he claimed to possess to "a third person, not Fishman". Mathew Fishman declined to recognize the Union at that time but he promised to call the union representatives the next morning.

On the next morning, November 26, the same three union representatives joined by two former Fishman employees, Lochetto and DeFillippo, picketed Fishman's plant with a sign stating that the employees of the Company were striking for "union conditions". As the employees came to work they were met by union organizers and informed of the existence of a strike. None of Fishman's employees entered the plant despite the fact that Foreman Worthy urged them to do so. None of Fishman's employees joined the picket line. Foreman Matteo had arrived at the plant at 6:45 A.M. on November 26 and the union representative, Brownstone, asked him to telephone Mathew Fishman and inform him of the situation and to request that he bring his lawyer and come to the plant. Matteo got in touch with Mathew Fishman as requested. Shortly thereafter Brownstone told Foreman Worthy that a strike was in progress, and that Fishman had been notified of this fact. At about 9 o'clock that morning all but one of the employees proceeded to the union hall at the direction of DiVincenzo, a union representative. A meeting was held and all of the employees who previously had not signed union authorization cards did so voluntarily. That night Mathew Fishman, Worthy, Matteo, and several other men specially hired, since the regular workmen were not available, worked at the plant to save a batch of skins from possible deterioration arising from excess exposure to a "pickling agent".

The employees remained out the following day, November 27. November 28 was a holiday, Thanksgiving Day, but when the men came to the plant on November 29 to receive their pay for the previous week they received notices of their discharge for "failure to report for work on Tuesday, November 26, 1957."

The Union filed unfair labor practice charges with the Board and after hearing and on August 15, 1958, the Trial Examiner found that Fishman was engaging in unfair labor practices and recommended that it be ordered to cease and desist from these practices and also to take certain affirmative steps as set out hereinafter. The Board affirmed the findings of the Trial Examiner with certain exceptions stated at a later point in this opinion and entered an appropriate order. The Board ordered Fishman to cease and desist from interrogating employees, from requesting them to report on other employees' union activities, from threatening to close the plant, or otherwise interfering with the employees' rights to organize. The Board's order also required the Company to offer reinstatement to eight striking employees [1] deemed to have been discharged discriminatorily even if such a course would involve discharging employees hired after November 29, 1957, and to make whole the wrongfully discharged employees for any loss of wages that might be suffered should Fishman fail to reinstate them in accordance with the Board's order. The posting of an appropriate notice also was required.

 Fishman makes a number of contentions. It asserts that the employees did not refrain from work voluntarily but were coerced by the organizers of the Union. The Company takes the position that the Board wrongly ignored testimony by Raymond Payne and Joseph Singleton, two Fishman employees, to the effect that they were forced by the Union to join the strike. The Board found no evidence of coercion but stated correctly that even if the Union had coerced some workers, the discharged employees still would be entitled to reinstatement for it is clear from the record that if any of the employees were coerced into striking, Fishman had no knowledge of this at the time the men were discharged and that therefore the purpose of the discharges was to discourage activities protected by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.[2] Fishman therefore was guilty of a violation of Section 8(a) (1) and 8(a) (3) of the Act, 29 U.S. C.A. § 158(a) (1) and 158(a) (3). See Radio Officers, etc. v. N. L. R. B., 1954, 347 U.S. 17, 44–46, 74 S.Ct. 323, 98 L.Ed. 455. Moreover, while misconduct during the strike by strikers themselves might have barred their reinstatement here the only coercion alleged was attributed solely to the union organizers, none of whom is involved in this reinstatement action. Further on this point, even if evidence of union coercion was relevant, the Trial Examiner and the Board were entitled to refuse, as they did, to credit the evidence of Payne and Singleton as to coercion. N. L. R. B. v. Jarka Corp., 3 Cir., 1952, 198 F.2d 618.

 Fishman also claims that it was justified in discharging the employees because the work stoppage greatly endangered the company's property. At least two Courts of Appeals have ruled that employees engaged in a work stoppage deliberately timed to cause maximum damage are not engaged in a protected activity and are subject to discharge. N. L. R. B. v. Marshall Car Wheel &

---

1. As named in Paragraph 2(a) of the Board's order.

2. Fishman filed a motion to reopen the record before the Board in order to introduce allegedly previously unavailable evidence of threats asserted to have been made by two organizers against employee Robert Milliner. This evidence consists of a transcript of a hearing before the Pennsylvania Unemployment Compensation Board of Review. Milliner testified that on November 26, 1957, the two union officials threatened to kill him if he crossed the picket line. Fishman asserts that this testimony was not available to it at the time of the hearing before the Board because Milliner feared reprisals from members of the Union. The Board's General Counsel contended, *inter alia*, that this evidence was immaterial to the employees' rights of reinstatement because the threats as testified to by Milliner were made by officials of the Union and not by employees. The Board denied the motion to reopen and its ruling was correct. See Cranston Print Works Company, 117 NLRB 1834, 1835.

Foundry Co., 5 Cir., 1955, 218 F.2d 409 and United States Steel Co., etc. v. N. L. R. B., 7 Cir., 1952, 196 F.2d 459. The Trial Examiner found that there was no threat of aggravated physical injury to the plant and therefore this doctrine is inapplicable. This finding is not seriously contradicted by the evidence. The strike began in the morning before the day's work started and Fishman produced no proof that a work stoppage at this time was peculiarly dangerous. The Board concurred in the position taken by the Trial Examiner.

We must also determine the propriety of the Board's cease and desist order as it relates to unlawful activities by Fishman in respect to the employees' rights to organize. The proscribed acts as we have said consisted of alleged spying by supervisory personnel on the workers' efforts to organize and threats to close down the plant if it were unionized. It is a difficult task to evaluate the nature and effect of the kind of activities demonstrated by this record. This is peculiarly true when the fact-finder under circumstances such as those at bar must distinguish between predictions that a plant will be forced to close if a union contract is signed and a threat to close the plant. The first kind of statement is protected by Section 8(c) but the latter type of statement constitutes an unfair labor practice under Section 8(a) (1). See N. L. R. B. v. Armstrong Tire & Rubber Co., 5 Cir., 1955, 228 F.2d 159; N. L. R. B. v. West Coast Casket Co., 9 Cir., 1953, 205 F.2d 902; N. L. R. B. v. Rockwell Manufacturing Co., 3 Cir., 1959, 271 F.2d 109; National Labor Relations Board v. McCatron, 9 Cir., 1954, 216 F.2d 212.

Any determination of the exact nature and effect of such statements can be made only with due regard for the context of the statements, the characters and economic positions of those who heard it, and the relationships existing between a company and its employees. The great advantage of specialized knowledge and experience in connection with these matters is obvious. It follows, therefore, that we as a reviewing tribunal should be careful not to substitute our judgment for that of the expert fact-finder. The Trial Examiner found that Fishman's foremen were spying on the employees in attempting to find out names of the organizers and the success of their efforts. He also concluded that certain of the foremen's statements were actually threats that the Company would close the plant if the Union came in. The Board endorsed this finding. We conclude that the finding was correct and supported by substantial evidence.

The Board in requiring Fishman, on application, to offer reinstatement to the eight discharged employees [3] to their former or substantially equal positions without prejudice to their seniority and other rights and privileges, even if such a course would involve the discharge of employees hired after November 29, 1957, is clearly within its corrective powers. N. L. R. B. v. United States Cold Storage Co., 5 Cir., 1953, 203 F.2d 924 and N. L. R. B. v. Leach, 3 Cir., 1956, 234 F.2d 400.

We also agree with the conclusion of the Board, in effect contrary to that of the Trial Examiner, that the conduct of a group of pickets, composed of eight employees [4] and five non-employees, on December 30, 1957, in respect to an attempt to load a truck of Lomar Transportation Company, was such as to disqualify the eight participant strikers from reinstatement by Fishman. See The American Tool Works Company, 116 N.L.R.B. 1681. Cf. Puerto Rico Rayon Mills, Inc., 117 N.L.R.B. 1355.

The notice required to be posted by the Board is proper in all respects.

Other points raised by the parties do not require discussion.

The order of the Board will be enforced.

3. See note 1, supra.

4. These eight men are named in note 6 of the Board's decision.

KALODNER, Circuit Judge (dissenting).

I would deny enforcement of the Board's order.

The evidence is clear that respondent's employees did not go on strike on the morning of November 26, 1957, nor was there a "spontaneous work stoppage" on their part as in N. L. R. B. v. Kennametal, Inc., 3 Cir., 1950, 182 F.2d 817, 819, 19 A.L.R.2d 562. It further establishes that all but two of respondent's employees came to respondent's plant at the customary time on the morning of November 26th, ready to report for work but were met at the plant's entrance by three union organizers who were not employed by respondent and two of respondent's employees who carried signs reading:

"Workers of
Morris
Fishman and
Sons, Inc.
Strike
For
Union Conditions
Philadelphia Leather Workers
Union Local 53.
Fur & Leather Dept., A.M.C. &
B.W. of N.A., AFL–CIO."

The record further discloses that respondent's employees were dissuaded from reporting for work because of the picketing described, and that they had not earlier voted to strike, had not discussed it or even had it in contemplation. Further, the record fails to disclose that the majority of respondent's employees had joined the union prior to the work stoppage and significantly the Trial Examiner's "Intermediate Report" makes no finding to the contrary.

Moreover, it is undisputed that on the afternoon of November 25th when the union organizers (not employed by respondent) made their initial demand on respondent's vice-president and plant manager, that he contract with the union they refused to display any evidence of their authority to represent the employees.

In view of the foregoing, the Board's finding that respondent's employees engaged in a "strike" and were discharged by respondent for doing so is utterly without basis.

I further find without basis the Board's further finding that respondent was guilty of unfair labor practices, by reason of the conversations between respondent's foremen and several of its employees. The finding was based on the following incidents:

(1) Foreman Matteo requested employee Rhem to "go around and see how many signed cards for the Union" and asked him "Do you know who it was started [the card signing] ?"

(2) Foreman Worthy told employee Milliner the respondent "couldn't be bothered with no union and he would shut down if the union came in." At the same time Worthy told Milliner to "vote whether you want the union or you don't want the union."

(3) Worthy "went into the employees dressing room and spoke to a number of employees there"; he asked them "to get to the plant early so that they could vote on whether or not they wanted the union" and told them "if they would get the Union in there the plant would close down."

There is absent in the foregoing incidents the presence of "threat" violative of the Act. At the most the respondent's foremen made known to the employees involved respondent's hostility to the union. Such hostility is not an unfair labor practice. In N. L. R. B. v. Rockwell Manufacturing Co. (DuBois Div.), 3 Cir., 1959, 271 F.2d 109, 117, 118, we held the kind of conversations above detailed not to be violative of the Act, since they were not coercive. To the same effect see N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 1952, 194 F.2d 370, certiorari denied 344 U. S. 819, 73 S.Ct. 15, 97 L.Ed. 638 where the employer expressed dislike for unions and inquired of employees as to the union's organizational activities; Sax v. N. L. R. B., 7 Cir., 1948, 171 F.2d 769, 772 where the employees were asked

whether they were "for the union" and whether they had signed union cards; N. L. R. B. v. W. T. Grant Co., 4 Cir., 1953, 208 F.2d 710 and N. L. R. B. v. Hinde & Dauch Paper Co., 4 Cir., 1948, 171 F.2d 240 where the foreman predicted plant shutdown in the event of unionization.

As we stated in the Rockwell case, supra, (271 F.2d at page 115) "the burden of proving the unfair labor practice is on the charging party" and that burden has not here been met.