**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**KOLMAR LABORATORIES, INC., Respondent.**

No. 16307.

United States Court of Appeals Seventh Circuit.

Dec. 19, 1967.

Marcel Mallet-Prevost, N.L.R.B., Nancy M. Sherman, N.L.R.B., Washington, D. C., for petitioner.

Egon W. Peck, Patrick Brigden, Milwaukee, Wis., for respondent.

Before HASTINGS, Chief Judge, and KILEY and FAIRCHILD, Circuit Judges.

HASTINGS, Chief Judge.

The National Labor Relations Board petitions, pursuant to 29 U.S.C.A. § 160 (e), for enforcement of its order that Respondent Kolmar Laboratories, Inc. cease and desist from committing certain violations of § 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1), and post appropriate notices. The Board's decision and order are reported at 159 NLRB No. 74.

Respondent is a private label cosmetic manufacturer, making and packaging cosmetics for brand name cosmetic manufacturers under their own labels. It operates plants in Milwaukee, Wisconsin, Port Jervis, New York, and Hollywood, California, and in several foreign countries.

On January 6, 1965, the International Union, Allied Industrial Workers of America, AFL-CIO filed with the Board a representation petition requesting an election among the production and maintenance employees at respondent's Milwaukee plant.

Five days later, on January 11, respondent sent each of its Milwaukee employees a letter on company stationery signed by Lessing Kole, respondent's

founder and chairman of the board. The letter stated that respondent's Milwaukee plant is geographically disadvantageous for a company in the private label cosmetic industry and that to compete effectively the plant should be located in Illinois or Indiana. In capital letters the letter stated that respondent had kept its plant in Milwaukee because Kole had "a deep moral obligation to not tear the roots of Milwaukee born people out of the city," and that "private label cosmetic concerns operate on an exceedingly low margin of profit." The letter closed with the assertion that its only function was to inform employees "that we cannot and will not further restrict our ability to operate without losing money."

Following the distribution of the letter the union, at a meeting for respondent's employees, distributed a pamphlet exalting the virtues of representation by it. The pamphlet stressed "job security" through seniority provisions embodied in a contract.

On January 21, respondent sent a second letter to its Milwaukee employees. This letter was signed by Richard Kole, respondent's president. It detailed the movement of respondent's customers to the Eastern United States and respondent's efforts to maintain the sales volume of the Milwaukee plant. It concluded: "You must realize that this situation very seriously limits our ability to increase our costs in Milwaukee. * * * There can be no JOB SECURITY if we do not take into account this situation. No Union can provide that security; indeed it can destroy such security as you now have."

Respondent's third letter, an unsigned one dated January 27, listed ten disadvantages of unionization. It ended with an admonition: "YOU know your interests better than anyone else. Be sure that no outsider impairs our ability to operate here in Milwaukee."

Two days later respondent sent its employees another letter from Lessing Kole. After questioning the union's qualifications to represent respondent's employees, and noting the union's job security propaganda, the letter stated:

"Nothing could be worse for our employees at Milwaukee than to swallow this propaganda. A union, knowing nothing about our industry, and completely ignorant of our special problems in operating a plant in Milwaukee, cannot force any action except at the expense of your job security. We cannot operate here if artificial economic roadblocks are thrown into our way. There is no law which would require us to continue to operate here if further difficulties are introduced which would make our operation here inefficient and less competitive.

\* \* \* \* \* \*

"In my previous letters I told you about some of the problems with which we are confronted trying to operate the plant in Milwaukee."

Respondent's fifth and sixth letters, on February 1 and 2 respectively, both referred to the economic disadvantages discussed in the earlier letters. The sixth letter discussed seniority policies at the Milwaukee plant.

Two days before the election, which was held on February 5, respondent mailed to each of its employees a 32 by 20 inch poster. The poster read in part:

"REMEMBER,—when you vote:

Your Job Security depends upon our ability to compete.

We cannot compete if we have interference.

Your cooperation is essential.

\* \* \* \* \* \*

"THE UNION KNOWS NOTHING ABOUT US

It knows nothing about our Milwaukee problems.

It knows nothing about our industry.

It knows it cannot keep its promises.

To meet its promises would force us to quit.

The Union offers nothing but unreality and insecurity."

Respondent concluded its campaign against the union with speeches to its em-

ployees on February 3. The significant portions of Richard Kole's speech are the following:

"Despite the union's efforts to rush the election I know that it would be a big mistake were you to vote a union into our plant here on Friday. If that unfortunate decision were made I am convinced that it could do irreparable harm to all of us and jeopardize our ability to continue our operations here. I am sure that no employee here would vote for the union on Friday excepting on the basis of a lack of information or because of misinformation. Because my father and I feel this so strongly we agreed that it would be better to communicate with you more than might be necessary, rather than too little.

\* \* \* \* \* \*

"When you vote on Friday remember that just like you can not unscramble eggs once they are scrambled, once you vote for the union you won't be able to get rid of it for at least a year. By that time it may be too late to undue any harm which might be introduced into our relationship."

Plant Manager E. J. Maruszewski suggested in his speech that the employees: "Ask the union—how many small companies were forced to close because of union demands, or forced to the wall by work stoppages, temporary and permanent, which put people out of work."

The election was held and the union lost by a vote of 59 to 44. The 11 challenged ballots were insufficient to affect the election results.[1]

After losing the election, the union filed a charge that respondent violated § 8(a) (1) of the Act by threatening to close or relocate its Milwaukee plant if the union won. The Board, adopting the findings, conclusions, and order of the trial examiner, found that respondent's letters, poster, and speeches, "taken together, reasonably tended to convey to the employees the belief or impression

that continued employment at the Milwaukee plant was linked by Respondent to their rejection of the Union at the forthcoming election." The Board ordered that respondent cease and desist from threatening its employees with plant closure or relocation or any other economic reprisals for election of the union or from violating its employees' section 7 rights in a like or related manner. The Board also ordered respondent to post appropriate notices.

If the Board's decision is supported by substantial evidence on the whole record, we are required to enforce it. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We have examined the record and have concluded that it contains substantial evidence supporting the Board's decision. We have considered the above-quoted excerpts in their proper context.

It is well settled that an employer violates § 8(a) (1) by threatening to close its plant if a union wins an election. See Madison Brass Works, Inc. v. N. L. R. B., 7 Cir., 381 F.2d 854 (1967); Wausau Steel Corp. v. N. L. R. B., 7 Cir., 377 F.2d 369 (1967); N. L. R. B. v. Taitel, 7 Cir., 261 F.2d 1, cert. denied, 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677 (1958), reh. denied, 359 U.S. 976, 79 S.Ct. 875, 3 L.Ed. 2d 844 (1959).

Respondent's pre-election campaign appears to have been calculated to impress its employees with three "facts." The first was that respondent's economic position at its Milwaukee plant was extremely precarious and that the effective reasons for continuing the Milwaukee operations were sentimental rather than economic. The second "fact" was that any impairment of respondent's competitive position in the market served by its Milwaukee plant would compel it to close the plant and transfer its operations elsewhere. The third "fact" was that the introduction of a union at the plant would

---

1. We are advised by respondent that a second election was held on August 2, 1966, as ordered by the Board, resulting in a rejection of the union by a vote of 122 to 58.

impair respondent's competitive position. These "facts" inescapably lead to the conclusion that election of the union would be tantamount to the termination of operations at Milwaukee and the consequent loss of employment.

■ We need not detain ourselves in linking together the excerpts from respondent's campaign pronouncements. The test is whether the likely import of respondent's pronouncements was coercive. Wausau Steel Corp. v. N. L. R. B., supra 377 F.2d at 372. Here the likely import was that if the union won, plant closure was a foregone conclusion.

Statements similar to respondent's have been held violative of § 8(a)(1) in decisions of this court. In Madison Brass Works, Inc. v. N. L. R. B., supra, 381 F. 2d at 856, where employer's president stated "among other things, that in the past employees were kept on when they could have been laid off; that [company president] and his father knew how much the weekly pay check means; that business had been bad the past few years and last year $11,000 was lost and [company officers] took no salary; that the coming of the Union could lead to strikes, strikes lose customers, lose money and stability for the company, and lost wages can never be regained; and that [company president] kept the business operating only in the interest of his father and the employees." In Wausau Steel Corp. v. N. L. R. B., supra, 377 F.2d at 371, where company's president stated "that increased expenses due to unionization might make it necessary to sell trucks, and to close the new steel department, and that if the union obtained a 22 or 22½ cent raise for the employees, Wausau would be forced out of business." In N. L. R. B. v. Economy Food Center, Inc., 7 Cir., 333 F.2d 468, 470 (1964), where employer's personnel manager told employee "that employees had better think it over or be unemployed if the Union 'got in' because the president couldn't pay the wages the Union would set up and would sell the company."

To the same effect, see N. L. R. B. v. Kolpin Bros. Co., Inc., 7 Cir., 379 F.2d 488, 489–490 (1967); N. L. R. B. v. MacCollum Paper Co., Inc., 7 Cir., 367 F.2d 761, 763 (1966); N. L. R. B. v. C. J. Glasgow Co., 7 Cir., 356 F.2d 476, 478 (1966); N. L. R. B. v. Realist, Inc., 7 Cir., 328 F. 2d 840, 843, cert. denied, 377 U.S. 994, 84 S.Ct. 1921, 12 L.Ed.2d 1046 (1964); Revere Copper and Brass, Inc. v. N. L. R. B., 7 Cir., 324 F.2d 132, 136 (1963); N. L. R. B. v. Kiekhaefer Corp., 7 Cir., 292 F. 2d 130, 133 (1961).

Respondent contends that where the employer has maintained a close relationship with its employees and its course of conduct does not show a pattern of unfairness to the union, these factors should be considered in determining whether its communications were coercive. It cites several recent decisions of this court in which these factors were found to render the employer's pronouncements innocuous.[2] In none of these cases was the message as ominous as in this case.

■ Respondent further contends it was merely giving its employees the facts, enabling them to make a reasonable and free choice. "It is well settled that an employer's 'prediction' of untoward economic events may constitute an illegal threat if he has it within his power to make the prediction come true." International Union of Electrical, Radio and Machine Workers, AFL-CIO v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757, 763 (1960). Respondent has the power to close or relocate its Milwaukee plant.

Finally, respondent contends it was merely answering the union's propaganda about job security. It suffices to note that the union's "job security" propaganda related clearly and solely to seniority. At no time did the union tell the employees it could prevent the respondent from closing or relocating the plant. Re-

2. N.L.R.B. v. Tom's Supermarket, 7 Cir., 385 F.2d 198 (1967); Indiana Rayon Corp. v. N.L.R.B., 7 Cir., 355 F.2d 535 (1966); N.L.R.B. v. Sparton Mfg. Co., 7 Cir., 355 F.2d 523 (1966); N.L.R.B. v. Mallory Plastics Co., 7 Cir., 355 F.2d 509 (1966).

spondent used "job security" as a strawman to attempt to justify its campaign of threats. Not until its last letter did respondent meet the seniority issue raised by the union.

As late as July 7, 1967, in Lincoln Manufacturing Co., Inc. v. N. L. R. B., 7 Cir., 382 F.2d 411, 414, we noted that it "is sometimes difficult to draw the line between vigorous oral and written presentation of a company's position and veiled threats of economic reprisal." We further pointed out that we were not at liberty to consider the matter *de novo*. We enforced the Board's order.

And so, in the present case, acting within the well defined limits of our appellate review, we find substantial evidence on the record as a whole to support the Board's findings that respondent engaged in coercive conduct in violation of § 8(a) (1) of the Act; that the cease and desist order of the Board should be enforced and that respondent should post the appropriate notice as directed.

The order of the Board under review will be enforced.

Enforcement ordered.