**MON RIVER TOWING, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

**National Maritime Union of America,
AFL–CIO, Intervenor.**

**No. 17735.**

United States Court of Appeals
Third Circuit.

Argued Sept. 29, 1969.

Decided Dec. 22, 1969.

Jack J. Rosenberg, Rosenberg & Lubow, Pittsburgh, Pa., for petitioner.

Roger Sabo, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., National Labor Relations Board, on the brief), for respondent.

Abraham E. Freedman, Stanley B. Gruber, Freedman, Borowsky & Lorry, Philadelphia, Pa., for intervenor.

Before STALEY, SEITZ and STAHL, Circuit Judges.

## OPINION OF THE COURT

STAHL, Circuit Judge.

Petitioner, Mon River Towing, Inc. (hereinafter Mon River), asks that we

set aside the order [1] of the National Labor Relations Board entered pursuant to its finding that petitioner had violated § 8(a) (1) and (2) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (2). These violations arose out of the negotiation of a collective bargaining agreement in late 1967 between petitioner and the certified representative of its employees, International Union of District 50, United Mine Workers of America, and its Local Union No. 14693 (hereinafter District 50). The Board has filed a cross-application for enforcement of the order.

Mon River operates a fleet of tugs engaged in towing coal and petroleum products. Its boats carry a crew of eight men, consisting of a captain, a pilot, normally four deckhands and one tankerman (engine man) and a cook. The boats are away from the home port in Belle Vernon, Pennsylvania, from two to ten days at a time.[2]

Mon River first recognized District 50 as the representative of its employees, and negotiated a three-year contract with the union, in December, 1964. Shortly thereafter the National Maritime Union (NMU)[3] filed a representation petition with the Board, and a consent election was held among Mon River's employees for a unit excluding captains and pilots. The election resulted in District 50's becoming the certified representative for the unit. District 50 also became the representative of the captains and pilots who chose it in a later private election. App. 130a. The December 1964 contract covering all employees, including captains and pilots, was subsequently revised to expire in March 1968.

In July 1967, Mon River's employees selected a committee of four to serve as union negotiators in bargaining for a new contract. Each representative was chosen from a different job classification covered by the existing contract. Since captains were included, one of their number, Archie Cowan, was chosen to serve on the negotiating committee.

Negotiating sessions were held in November and December of that year, and agreement on a new contract was reached December 13, 1967.[4] The members of the union negotiating committee, including Captain Cowan, almost immediately undertook a boat-by-boat solicitation of the employees to secure ratification of the contract. Ratification had been agreed upon between the employer and the union as a prerequisite to the contract's becoming effective. App. 47a–48a; 229a; 233a. Between December 15 and December 17, the committee boarded each of Mon River's seven boats at various points along the Monongahela and Ohio Rivers, including boats plying the river in Ohio and Kentucky, for the purpose of explaining the contract. This was followed by secret balloting.

After obtaining the vote on two of the boats, the committee was joined in boarding the remaining five boats by Mon River's president, Howard Guttman. On these boats Guttman introduced the negotiating committee to the assembled crew members.[5] He then urged approval of the proposed contract, declaring that

---

1. 173 N.L.R.B. No. 224 (1969); Appendix (App.) 34a.

2. A few boats on trips south on the Ohio River remain away for longer periods of time, sometimes up to four or five months.

3. The NMU is an intervenor in the present case, seeking enforcement of the Board's order.

4. Although, as noted, the old contract, did not expire until March 1968, it served to bar new representation proceedings only until December 31, 1967, three years after the original contract took effect.

The NMU had resumed organizational activity among Mon River employees in the latter half of 1967. It filed a second representation petition subsequent to the events related here.

5. There was testimony that Guttman's purpose in accompanying the negotiating committee was to make sure the boats were stopped because he "was the only one with the authority to bring them in." App. 179a. One of the boats Guttman boarded, however, was tied up at the home port. App. 230a.

this was about the best agreement that he could agree on, * * * this was a fair agreement and a just agreement that they had come up with and negotiated, and if they couldn't come to a suitable agreement that *he would have to more than likely let the coal trade and the gas contracts* * * * go * * *.[6] (Emphasis added.)

Guttman then turned the meeting over to the union committee and departed before the balloting took place. The contract was approved by an overall vote of 37 to 22, and was signed by the negotiating committee on December 19, 1967.

Charges were filed against Mon River by the NMU. After hearing, the trial examiner found [7] that:

(1) negotiating committee member Cowan, a boat captain, was a supervisor within the meaning of § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), and therefore Mon River had violated § 8(a) (1) and (2) by bargaining with the committee and permitting a supervisor to represent employees;

(2) Mon River had violated § 8(a) (1) and (2) in permitting Cowan to participate actively in the union so-

licitation of approval of the new agreement by the employees; and

(3) Guttman's statements amounted to a threat to terminate Mon River's business if the employees failed to ratify the contract and constituted conduct which was coercive and which interfered in union affairs in violation of § 8(a) (1) and (2).[8]

The Board adopted the trial examiner's findings and recommended order.[9] In significant part the order requires that Mon River cease threatening employees, stop interfering in union affairs, and refrain from giving effect to the contract negotiated in December 1967.[10] The last requirement is particularly important because it would eliminate the contract as a barrier to new representation proceedings.

Mon River asserts that its boat captains should not be deemed supervisors under the Act, but its main contention is that even if they are their supervisory role is so minor that the Board may not properly base the finding of unfair labor practices on the union activity of Captain Cowan pertaining to a contract covering his employment. Petitioner also disputes the finding of an unfair labor practice in the statements of its president.

---

6. Testimony of witness William Russell Cowell, Jr., App. 71a. See also App. 49a, 52a, 53a, 54a.

 Guttman denied making this statement on the boats but the trial examiner credited the testimony of Cowell, a member of the union negotiating committee, corroborated by Nicholas Young, also a member of that committee. App. 18a, 79a, 81a, 82a.

 Guttman had made similar statements in several of the company's earlier meetings with the union negotiating committee, App. 47a, 79a, 81a, but the trial examiner held that the "statements made by Guttman in the course of negotiations are not alleged or found to be violative." App. 25a n. 28.

7. App. 2a.

8. 29 U.S.C. § 158(a) (1) and (2):
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 157 of this title;
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *.

 The trial examiner found that Guttman's purpose in the boat-by-boat trek "was to assure, if possible, that the employees would ratify the agreement he had reached with the union committee 3½ months before the expiration of the existing contract, at a time when other unions were engaged in organizational activity among his employees." App. 22a.

9. Note 1, *supra.*

10. The ineffectiveness of the agreement does not preclude the continued representative status of District 50. The effect of invalidating the agreement is to permit other unions to petition for a representation election. App. 29a–30a.

Mon River's claim that the captains of its boats are not supervisors can be disposed of readily. The Act defines a supervisor as an individual who uses independent judgment in the exercise of other than routine authority over the employment or conduct of employees and in the interest of the employer.[11] It has been observed that gradations in the degree of authority over fellow employees "are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor,'" N. L. R. B. v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961). Our review is limited to the determination of whether the conclusion of the trial examiner and the Board here is supported by substantial evidence on the whole record. N. L. R. B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1089 (8th Cir. 1969); Pulley v. N. L. R. B., 395 F.2d 870, 875 (6th Cir. 1968); Warner Co. v. N. L. R.

B., 365 F.2d 435, 437 (3d Cir. 1966). In cases of this nature we must give the "usual deference to Board expertise in applying statutory terms to particular facts." Hanna Mining Co. v. District 2, Marine Engineers Beneficial Ass'n, 382 U.S. 181, 190, 86 S.Ct. 327, 332, 15 L.Ed. 2d 254 (1965).

The trial examiner found that Mon River's captains are responsible for the safety of the boat, the crew and the cargo while under way [12] and that they evaluate crew members' work and ability and make corresponding assignments to particular jobs and watches. She also found that the captains had granted employees permission to leave the boat during off-duty hours and had recommended discharge of errant crew members while away from the home port. The company's evidence tended to minimize the actual exercise of authority by the captains and to show that on some matters the authority they did possess was not final.[13] We believe this was clearly in-

---

11. 29 U.S.C. § 152(11):

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. It is well established that this language is to be interpreted in the disjunctive so that a person having authority in only one of the enumerated areas may be held to be a supervisor. N. L. R. B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1089 (8th Cir. 1969); Pacific Intermountain Express Co. v. N. L. R. B., 412 F.2d 1, 3 (10th Cir. 1969); N. L. R. B. v. Howard Johnson Co., 398 F.2d 435, 439–440 (3d Cir. 1968).

12. Captain Cowan himself testified that he was "responsible to the Company for the safe operation of the vessel and crew and tow," App. 134a, and that he "can be held liable" because he is "a licensed master pilot under the Coast Guard." App. 145a.

In a colloquy with counsel for the intervenor, Mon River's chief operations officer, Port Captain Cowell, Sr., testified as follows:

Q. * * * Today don't the captains have to exercise some independent judgment in the operation of the boat and the direction of the crew?

A. Where safety of cargo and personnel are concerned, yes.

Q. Now, what would be an example of where safety of cargo and personnel would be concerned.

A. Weather conditions, high water conditions, unsafe practices within the working crew, unsafe equipment that we're handling.

Later, in response to a question by the trial examiner, Cowell said:

A. * * * I mean, the motor vessels do not come under inspection, but yet they are covered by the Coast Guard rules of the road, which are safety measures.

Q. And the boat captain has to see that they're complied with?

A. That's right. (App. 217a.)

13. Mon River's contention that its boats were sent out for more than a week with no supervisors among a crew of eight is difficult to believe, even assuming that

sufficient to overcome the substantial evidence relied on by the examiner and the Board, and we hold that the captains were properly found to be supervisors.[14]

As indicated, on the strength of the conclusion that Captain Cowan was a supervisor, the trial examiner and the Board found that Mon River had transgressed upon employees' rights and interfered in union affairs in violation of § 8(a) (1) and (2) by negotiating with a bargaining committee of which Cowan was a member. The rationale upon which this holding is based was originally set forth by the Board in Nassau and Suffolk Contractors' Association, Inc., 118 N.L.R.B. 174 (1957).[15]

In that case the Contractors' Association had negotiated a collective bargaining agreement with a union committee which included master mechanics who were found to be supervisors. Although holding that minor supervisory personnel may properly be included in a collective bargaining agreement and that they have some right to participate in the internal affairs of the union to which they belong, the Board found that the Association had violated the Act by allowing supervisors to represent employees in contract negotiations. The Board reached this conclusion in Nassau despite significant union control over the master mechanics, who were required to be union members, who held their positions only with union approval and who served simultaneously as union job stewards.

The question there, as here, was the extent to which supervisory union members may be permitted to participate in union affairs. Section 7 of the Act, 29 U.S.C. § 157, clearly protects the organizational and bargaining rights of employees only, and § 2(3), 29 U.S.C. § 152(3), establishes that this protection does not extend to supervisors,[16] even though there is no legal barrier to their being union members.[17] Supervisors have no statutorily protected right to participate in union affairs, N. L. R. B. v. Employing Bricklayers' Ass'n, 292 F.2d 627, 629 (3d Cir. 1961), and it is clear that where they do so it is at the employer's sufferance, subject to the limitations of the Act. Although an employer may believe it to be to his advantage to negotiate terms of employment for supervisors through a labor organization, he may no more prejudice the *protected* organizational and bargaining rights of his employees through this negotiation than through any other deliberate or innocent scheme. The possibility that an employer's motivation may be entirely innocent will not save his policy where it may be prejudicial to the rights of his

---

the traditional role of a ship's captain has no bearing on this case. *See* Vega v. N. L. R. B., 341 F.2d 576, 577 (1st Cir.), *cert. denied*, 382 U.S. 862, 86 S.Ct. 123, 15 L.Ed.2d 100 (1965) ; Eastern Greyhound Lines v. N. L. R. B., 337 F.2d 84, 87 (6th Cir. 1964).

14. In Mardril, Inc., 119 N.L.R.B. 1174 (1957), which also involved a District 50 local, boat captains working for off-shore drilling companies were held to be supervisors. 119 N.L.R.B. at 1181. In other cases, towboat pilots, Bernhardt Bros. Tugboat Service, Inc. v. N. L. R. B., 328 F.2d 757, 758 (7th Cir. 1964), and masters, mates and pilots serving on barge company vessels, Local 28, International Organization of Masters, Mates and Pilots v. N. L. R. B., 116 U.S.App.D.C. 110, 321 F.2d 376, 377 (1963), have been held to be supervisors. For a recent broad interpretation of the concept of supervisor under the Act, see Pacific Intermountain Express Co. v. N. L. R. B., 412 F.2d 1 (10th Cir. 1969). See also Annot., 11 A.L.R.2d 249 (1950).

15. *See also* Powers Regulator Co. v. N. L. R. B., 355 F.2d 506, 508 (7th Cir. 1966).

16. *See* Hanna Mining Co. v. District 2, Marine Engineers Beneficial Ass'n., 382 U.S. 181, 188, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965) ; N. L. R. B. v. Texas Bolt Co., 313 F.2d 761, 763 (5th Cir. 1963) ; Annot., 40 A.L.R.2d 415 (1955).

17. Section 14(a), 29 U.S.C. § 164(a) :
 (a) Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

employees. N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L. Ed.2d 308 (1963).[18]

The Board, in recognition of the purpose of the Act to free collective bargaining from all taint of employer control, International Ass'n of Machinists, etc. v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940); Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. N. L. R. B., 109 U.S.App.D.C. 315, 287 F.2d 354, 361 (1961), held in *Nassau,* as here, that there is prejudice in allowing supervisors to negotiate on behalf of employees, even where their union loyalties are strong:

> [W]e do believe that it is improper for supervisors, even those with predominantly union loyalty to serve as negotiating representatives of employees; and to the extent that the employer acquiesces in such participation the employer is guilty of unlawful *interference* with the administration of the Union. * * * [T]he mechanics remain in part agents of their employers with a resulting divided loyalty and interests. * * * *Employees have the right to be represented in collective bargaining negotiations by individuals who have a single-minded loyalty to their interests.* Conversely, an employer is under a duty to refrain from any action which will interfere with that employee right and place him in even slight degree on both sides of the bargaining table. 118 N.L.R.B. at 187. (Emphasis by Board.)

The *Nassau* doctrine has been approved by this court, N. L. R. B. v. Employing Bricklayers' Ass'n, 292 F.2d 627 (3d Cir. 1961), and Mon River does not dispute the propriety of the general rule that supervisors should not be allowed to negotiate on behalf of employees. However, it asks us to limit the applicability of the rule, contrary to the Board's holding in *Nassau,* by distinguishing between the typical employer-oriented supervisor and a "minor" supervisor whose interests are largely identical to those of the rank-and-file employees. It claims that if its boat captains are supervisors, their role as such is so minor that they should be allowed to participate in negotiations for a contract covering them as well as all other employees. Finally, Mon River argues that it would be unjust to deprive its "minor" supervisors of the right to participate in collective bargaining to protect their interests.

There are several defects in this position. First, there is nothing in the record, other than the claim that the captains are only minor supervisors, to indicate that they really do have strong sympathies with the rank and file, and we see no reason to assume that they do.

Second, it is not as clear as Mon River asserts that in order to protect the interests of its boat captains it is necessary that they actively participate in union affairs.[19] To the extent that the interests of the captains are identical with those of rank-and-file employees, negotiations by such employees alone would seem to afford the captains all the protection they need. On the other hand, if negotiation on their own behalf is essential to adequately protect the captains, nothing prevents Mon River from negotiating a separate contract with them. There seems to be no reason, therefore, to overlook the possibility of even small detriment to the effective representation of employee interests inherent in having a supervisor participate as a member of the union negotiating committee.

---

18. In fact, the court said in Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. N. L. R. B., 109 U.S.App.D.C. 315, 287 F.2d 354, 360 (1961), that "an employer may properly be held responsible for 'interfering' in the affairs of a union because of participation by his supervisors *even though such participation was not expressly authorized or ratified."* (Emphasis added.)

19. *See* Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. N. L. R. B., *supra,* 287 F.2d at 361–362.

Third, in the final analysis, the company's argument requests us to assume "the responsibilit[y] *imposed by the Act primarily on the Board* to appraise carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases and in light of the Board's special understanding of these industrial situations." N. L. R. B. v. United Steelworkers of America, 357 U.S. 357, 362–363, 78 S.Ct. 1268, 1271, 2 L.Ed.2d 1383 (1958). (Emphasis added.)

■ In view of the need to assure the complete devotion of union negotiating teams to employee interests, we see no reason to interfere with the Board's conclusion that effective collective bargaining requires Mon River's boat captains to be excluded from representing employees. We agree with the Board that this is a crucial area of labor law and that care must be taken to avoid any possibility of abuse.

Mon River places some reliance on Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. N. L. R. B., *supra*, in support of its position on "minor" supervisors. *Local 636* dealt with supervisory participation in a broad spectrum of union activities. The court there held that *participation by supervisors in the internal affairs of unions of which they were members should be approved on a case-by-case basis, so long as the rights of employees are not harmed thereby.* While the court noted that the nature of a supervisor's position would be relevant in determining the extent of participation in union activity permitted to him, nothing the court said there suggests approval for having even "minor" supervisors sit on negotiating committees. It clearly recognized that the protection of employee representation in collective bargaining from employer control is of primary importance. Undoubtedly, the danger of such control would be great where supervisors participate in contract negotiations.[20] Indeed, the court sustained the finding of an unfair labor practice in connection with such negotiations in that case. Thus both on principle and authority, we have no hesitancy in rejecting Mon River's argument in this respect.

■ Similarly, we disagree with Mon River's position that it was not an unfair labor practice for Captain Cowan to have participated as a member of the negotiating committee in the boat-by-boat pursuit of ratification of the proposed contract. Mon River's argument is essentially an extension of that discussed above. It asserts that since the contract covered him, Captain Cowan had a right to participate in the quest for ratification. It is clear, however, that employers have no right to intrude upon procedures by which employees decide to accept or reject a proposed contract.[21] Therefore, the Board may properly act to protect from potential interference the exercise of employee rights in this context.

The Board concluded that Cowan's status as a supervisor and as a member of the committee seeking ratification would tend to inhibit employees in free and critical discussion of the merits and defects of the proposed contract[22] and to place the employer's stamp of approval upon Cowan's, and the negotiating committee's, view of the contract. Since the pol-

---

20. *See* N. L. R. B. v. Employing Bricklayers' Ass'n, 292 F.2d 627 (3d Cir. 1961), where we held, in approving the *Nassau* doctrine, that supervisor-union members would not be allowed to vote for union officers. The right to vote was denied the supervisors because of the possibility that through it they would be able to assert some control over the men setting union economic policy and conducting contract negotiations.

21. *Cf.* N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); Houchens Market v. N. L. R. B., 375 F.2d 208, 212 (6th Cir. 1967).

22. The trial examiner stated that "Cowan's supervisory status would itself tend to restrict the freedom of thought, discussion and action among the rank-and-file crewmembers." App. 17a.

icy of the Act is to insulate the assertion by employees of their rights through collective bargaining from fear for their jobs, Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 40, 74 S.Ct. 323, 98 L. Ed. 455 (1954); Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry v. N. L. R. B., *supra*, we sustain the Board's finding of a violation of § 8(a) (1) and (2) in this respect also.

Lastly, we come to the question of whether the business termination statement made by Mon River president Guttman, recounted above at page 3, was properly found by the Board to violate the Act. Petitioner argues that the finding was improper because the statement was merely an expression of opinion containing no threat of reprisal and hence was protected by § 8(c).[23]

It is well established that even speech with a potentially coercive effect does not support the finding of an unfair labor practice unless it contains an indication that the employer contemplates the use of reprisal, force or reward to dissuade employees from exercising their protected rights. Guttman's statement could not be held to violate the Act, therefore, unless the reference to the possibility of petitioner's ceasing operations if the contract was not ratified was a threat of reprisal. Mon River would have us hold that the language here was not threatening because it was simply a prediction that an increase in costs greater than that contemplated by the proposed contract would put the employer at a competitive disadvantage and force it out of business.

However, language may *imply* a threat as well as constitute a threat directly, and the problem of drawing the line between a prediction and an implied threat is often one of great difficulty. As the economic dependence of employees on their employer may cause them to be peculiarly sensitive to nuances in language which would be lost on a neutral observer, the possibility that a statement contains an implied threat must be judged from the employee's point of view.[24] For that reason the expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer.[25] Our scope

---

23. 29 U.S.C. § 158(c):
 (c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

24. Thus the Supreme Court has recently observed that the balancing of the conflicting rights of the employer to free speech and that of the employees to engage in protected activities
 must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).
 *See also* N. L. R. B. v. Finesilver Manufacturing Co., 400 F.2d 644, 646 (5th Cir. 1968); N. L. R. B. v. Kolmar Labora-

tories, Inc., 387 F.2d 833, 837 (7th Cir. 1967); Wausau Steel Corp. v. N. L. R. B., 377 F.2d 369, 372 (7th Cir. 1967); Hendrix Manufacturing Co. v. N. L. R. B., 321 F.2d 100, 104 (5th Cir. 1963); N. L. R. B. v. Morris Fishman and Sons, Inc., 278 F.2d 792, 796 (3d Cir. 1960).
 As pointed out by the Board in its brief, actual proof that any of the employees felt threatened or coerced is not required where the Board finds that the employer's statement is such that a tendency to interfere can be reasonably inferred. Darlington Manufacturing Co. v. N. L. R. B., 397 F.2d 760, 772–773 (4th Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969); Local 542, International Union of Operating Engineers v. N. L. R. B., 328 F.2d 850, 852–853 (3d Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964); Hendrix Manufacturing Co. v. N. L. R. B., *supra*, 321 F.2d at 105.

25. In N. L. R. B. v. Morris Fishman and Sons, Inc., 278 F.2d 792 (3d Cir. 1960), it is said,
 Any determination of the exact nature and effect of such statements can be

of review is limited to inquiry as to whether the Board's determination is reasonable and supported by substantial evidence.[26]

▮ The courts have often said that whether warnings of adverse economic consequences constitute threats of reprisal may depend in part on whether these consequences are within the control of the employer.[27] If the employer has the power to bring about the results projected, the language is deemed to contain an illegal implied threat.

▮ Usually the cessation of operations is well within the control of the employer. It must be recognized, however, that competitive conditions may be such as to take that control out of his hands, as he cannot be required to continue an uneconomical operation. Therefore, a statement that increased costs may force the employer to cease operations may constitute a good-faith prediction protected by § 8(c). Recognition of this reality does not mean that all predictions of this type are protected, however. Presumably it is true that any business will become unprofitable if costs become too high. Thus if employees insist on astronomical wages, an employer may be forced out of business. But a forecast of this result may be entirely unrelated to the actual level of wages sought. Therefore, if an employer seeks to influence his employees in the exercise of their protected rights by predicting that he will be forced to shut down operations, the Board may properly conclude that this language threatens reprisal unless it is shown to have been made in good faith. N. L. R. B. v. Miller, 341 F.2d 870, 872–873 (2d Cir. 1965). Since it is the import of the language to the employees that is crucial, in making such a prediction the employer must eliminate the atmosphere of threat by demonstrating to the employees that the predicted consequences are, in fact, economically dictated in the given circumstances.

This is the teaching of N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Speaking for the Court, Chief Justice Warren observed that an employer may

make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, *the prediction must be carefully phrased on the basis of objective fact* to convey an employer's belief as to *demonstrably probable consequences beyond his control * * *.* If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only

made only with due regard for the context of the statements, the characters and economic positions of those who heard it, and the relationships existing between a company and its employees. The great advantage of specialized knowledge and experience in connection with these matters is obvious. 278 F. 2d at 796.

The Supreme Court observed in *Gissel, supra,*

that a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship * * *. 395 U.S. at 620, 89 S.Ct. at 1943.

26. N. L. R. B. v. Sinclair Co., 397 F.2d 157, 161 (1st Cir. 1968), *aff'd sub nom.,* N. L. R. B. v. Gissel Packing Co., *supra*; P. R. Mallory & Co. v. N. L. R. B., 389 F.2d 704, 707 (7th Cir. 1967) ; N. L. R.

B. v. Kolmar Laboratories, Inc., 387 F.2d 833 (7th Cir. 1967) ; Surprenant Manufacturing Co. v. N. L. R. B., 341 F.2d 756, 760 (6th Cir. 1965) ; N. L. R. B. v. Realist, Inc., 328 F.2d 840 (7th Cir.), *cert. denied,* 377 U.S. 994, 84 S.Ct. 1921, 12 L.Ed.2d 1046 (1964) ; N. L. R. B. v. Morris Fishman and Sons, Inc., 278 F.2d 792, 796 (3d Cir. 1960).

27. P. R. Mallory & Co. v. N. L. R. B., 389 F.2d 704, 707 (7th Cir. 1967) ; N. L. R. B. v. Kolmar Laboratories, Inc., 387 F.2d 833, 837 (7th Cir. 1967) ; N. L. R. B. v. Yokell, 387 F.2d 751, 756 (2d Cir. 1967) ; N. L. R. B. v. River Togs, Inc., 382 F.2d 198, 202 (2d Cir. 1967) ; Surprenant Manufacturing Co. v. N. L. R. B., 341 F.2d 756, 761 (6th Cir. 1965) ; International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757, 763 (1960).

to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. 395 U.S. at 618, 89 S.Ct. at 1942. (Emphasis added.)

 Recognizing the significance of the pronouncements of *Gissel* for the instant case, Mon River asserted in oral argument that the principles for which *Gissel* is authority are not applicable here. It would limit *Gissel* to the context of an organizational campaign in which the employer engages in "union busting" tactics. However, the present case, in which the employer sought to encourage ratification of a collective bargaining agreement, involved, as did *Gissel*, an effort to influence the exercise by employees of protected rights. We perceive no difference in the degree of protection afforded by the Act to the various rights guaranteed by § 7.[28] In Paranite Wire & Cable Division, Essex Wire Corp., 164 N.L.R.B. No. 48 (1967), a collective bargaining ratification case, the Board reversed the trial examiner and rejected the distinction sought to be made here, concluding that a threat to discontinue business also constituted a violation "when directed at non-organizational activities protected by Section 7 of the Act." We likewise reject the proposition that an employer has greater license to threaten and coerce his employees in a collective bargaining context than in the process of an organizational drive.

Applying the standards of *Gissel*, Guttman's statements did not seem to be based on objective fact nor were they concerned with demonstrably probable consequences. He declared that Mon River might stop its coal and petroleum operations if the agreement was not ratified because it could not afford any con-

tract more costly than that already negotiated. Nowhere does it appear, however, that the negotiation of a new agreement would necessarily have resulted in greater labor costs. The employees might have been inclined not to ratify the agreement because they desired improvement in provisions which could have been revised at little cost, such as work schedules. Furthermore, it was not then, and it is not now, established that Mon River could not, in fact, meet higher labor costs out of current levels of income, or out of increased income, or from reduced costs in other areas.

Petitioner points to Textile Workers Union of America v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), in which the Court held that "an employer has the absolute right to terminate his entire business for any reason he pleases." The Court said later, however,

Nothing we have said in this opinion would justify an employer's interfering with employee organizational activities by threatening to close his plant, as distinguished from announcing a decision to close already reached by the board of directors or other management authority empowered to make such a decision. 380 U.S. at 274 n. 20, 85 S.Ct. at 1001.

The Board relied on this clarification in *Darlington* to find a violation in the *Paranite* case. Furthermore, *Gissel* underscores the Supreme Court's view on threats to close business operations designed to influence employee conduct.

 We hold to be reasonable, therefore, the Board's determination that the statements which Guttman made threatened and coerced Mon River employees.

The petition to set aside the order of the Board will be denied and the order will be enforced in full.

28. 29 U.S.C. § 157:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *.